THE WESTERN AND ATLANTIC RAILROAD *vs.* BLOOMINGDALE.

[Jackson, C. J , being disqualified in this case, Judge Branham, of the Rome circuit, was appointed to preside in his stead.]

No person shall recover damages from a railroad company for injury to himself, where the same is caused by his own negligence, or where, by the use of ordinary care, he could have avoided the consequences to himself, caused by defendant's negligence.

(*a.*) The facts of this case show that the injury to the plaintiff was the result of his own negligence, and could have been avoided by

the exercise of ordinary care on his part, and he was not entitled to recover therefor.

(b.) It was left in doubt by the evidence in this case whether the in-jury was inflicted by the engine of the defendant or some other engine.

(c.) Under the facts of this case, the charge of the court below in reference to ringing the bell when approaching public crossings was not applicable, but when considered all together, the charge was as favorable to the defendant as it should have been.

(d.) The doctrine of contributory negligence is of force in this state, but it does not apply where the plaintiff's own negligence was the sole cause of the injury, or where, by the exercise of ordinary care, he could have avoided the consequences to himself, caused by the defendant's negligence.

October 3, 1885.

Railroads. Negligence. Damages. Before Judge HAM-MOND. Fulton Superior Court. April Term, 1884.

Reported in the decision.

JULIUS L. BROWN : W. D. ELLIS, for plaintiff in error.

GEORGE T. FRY, for defendant.

BRANHAM, Judge.

In this case, the jury found $2,500 damages for the plaintiff, and the defendant, who is the plaintiff in error here, moved for a new trial, which the court below refused, and error is assigned on that ruling of the court.

The plaintiff, Bloomingdale, alleges that, on the night of the 11th of August, 1883, in returning from the city of Atlanta to his home, south of the cemetery, and beyond Howell street, he went down Decatur to Young street, turned into and went down that street until he reached that part of the right of way lying between the Air-Line and the Georgia Railroad tracks; that this space between these tracks, which is about eight feet in width, was in gen-eral use in the day time, and in occasional use at night, as a foot-way for persons residing south of or beyond Howell

street. Young and Howell streets both cross these rail-road tracks at right angles, and are about two hundred yards apart; that he turned from Young street into the space between these railroad tracks, and walked along down the same towards Howell street, until he reached a point about fifty yards south of Young street, when he heard the 9 o'clock Georgia train coming down behind him on its track. This track was on his right, next to the cemetery. He walked on down this way until he reached a point one hundred and fifty yards south of Young street and forty-six yards north of Howell street, when, to get out of the reach of the engine of the Georgia train, which was emitting steam and hot water as it passed along, he stepped up on the Air-Line (Atlanta and Charlotte) track, at or near the junction of one of two switches which connect with the main line on the Decatur street side, and as he did so, the defendant's engine, tender or car—he is unable to say which—backed down on him, ran him down and ran across his foot, mashing his toes, and in consequence thereof, the front part of his foot had to be amputated. He says the engine was a main-line and not a switch-engine; that it then carried four cars, was being used for switching purposes in delivering the cars to connecting roads at that point; that it ran down the main line of the Air-Line Road, just before the Georgia train ran out on its main line, and that, while it was backing up the track on its return, at or about the point where the switches join the main line, and on the main line, and about nine or half-past nine o'clock at night, there being no lights on the engine, tender or cars, it ran over his foot and injured him as stated; that he did not hear this engine and cars backing up the track, because of the noise made by the out-going Georgia train, and could not see it because it was dark and there were no lights on it; that if it had been properly lighted, he would have seen it and could have avoided the injury.

One of the main questions at issue was, whether the

injury was, in fact, done by the defendant's engine, tender or cars. The plaintiff sought to show it was so done by direct evidence, and by other evidence, which he claims shows it could not have been done by the engine or cars of other companies using this railroad yard. On the contrary, the defendant claimed that the direct evidence was altogether unsatisfactory, and that it was highly probable that the injury was done by the engine or cars of some other company.

The plaintiff's testimony, which is the only direct evidence in his behalf on this issue, is very much confused, to say the least of it. He says he could not hear this engine and cars coming; that it was a dark night, and there were no lights on it, and he could not see it until it was within a few feet of him. He knew the engine, because he saw white men get off the engine and back on it again; but he could not describe the engine, or say whether the men were high or low men. One of them, who, he thinks, had a mustache, and who was standing by him on the ground, offered to pay some one to take him away. It will be seen hereafter that all this occurred while the engine was standing on a different side track from that on which the plaintiff was lying. He further says that he was unconscious and insensible for a few minutes, when it struck him; that it was the " hind end " of the tender that struck him ; that he knew it was the defendant's engine that ran across his foot, knew it by its looks, though he did not see it till it struck him; and finally, that he knew it because it was time for that engine to be there, and that he knew it in no other way ; that it stopped within twenty feet after it struck him, and yet that it was running fifteen miles an hour. The plaintiff also claimed that it was a main-line engine, and that it ran down before the Georgia train went out; that there were no lights on it. Roberts said the defendant's engine went down a "little ahead " of this train. But Rose, one of the plaintiff's witnesses, says it went afterwards.

The conductor and crew of the engine consisted of the following persons: C. B. Smith, conductor; W. W. Gravitt, engineer; W. M. Cullom, fireman; W. E. Dyer and W. M. Fulks, couplers.

They say the engine was a regular switch engine, named "Kentucky;" that it ran down after the Georgia train went out, and that it was provided with lights.

If the engine went down after the Georgia train left, then it could not have injured the plaintiff, for he says he was injured as the Georgia train passed, and as he stepped up on the Air-Line track to get out of its way.

The defendant's engine ran slowly, and it seems morally certain, unless the conductor and the whole crew committed willful and corrupt perjury, that the plaintiff was not injured by their engine, or if it was so done, they had no knowledge of it.

When the plaintiff was found by this crew, he was on the outer side-track, near Decatur street, while the defendant's engine was standing on the middle side-track, near the place where he was then lying. He said he had been hurt some twenty minutes, had walked from one to two hundred yards, and could not tell what train had injured him.

Some one at the engine said, "Gentlemen, if any of you know who this gentleman is, carry him home, and we will pay for it." This was said by parties, provided with lights, in charge of the engine. The witness adds, the gentleman who made this remark was on the ground, at the engine, with a light in his hand.

The witness, James Hughes, heard some one on the engine say, "Some one take him away, we want to get out," and he offered to pay a colored man to help him take him away.

Some one said it was the State Road engine that hurt the plaintiff. Those in charge of the engine were near by when this remark was made, and the witness "supposed" they could have heard it, but it was made in a "little

noise," and he did not know whether they heard it or not. The engine was on one side-track, the plaintiff was found on another. An examination of this part of the evidence will show that its bearing on this issue is remote and unsatisfactory. There is no proof that those in charge of the engine heard what was said about what engine caused the injury, and ordinary humanity would have prompted any one required to leave the scene, as was the case with them, to do what was offered to be done—that is, to pay for removing the wounded man.

Considerable evidence was introduced by both parties to show the movements of other engines and trains at and about the time and place the injury occurred.

There was a "main-line" engine of the defendant, used as a "hostler's" engine in putting away cars, in charge of conductor Gresham, engineer Anderson, and Bowen, a train-hand, which went down to this yard about 6 o'clock and again between 11 and 12 o'clock P. M. of this day. This engine could not have injured the plaintiff.

There was a train that went out at 4:20 and one that came in at 12:50 A. M. The trains that were moving nearly together were the Georgia Express, the defendant's engine, "Kentucky," and train number 16. Number 16 was a train known as the Air-Line Freight. The witness, George, says this train came in about half-past 8 or 9 o'clock. McGhee, Air-Line car repairer, says it came in about 9:30 o'clock; that this was its schedule, to the best of his recollection. Sellers, the night train-dispatcher, says its schedule was 8 o'clock, but it was twenty minutes late that evening. Roberts says it was due about 8 o'clock, but it was a few minutes late that evening. The defendant's switch-list of the 11th August shows that the defendant's engine delivered cars at the Georgia Railroad at 8:55, at the West Point Railroad at 9:05, and at the Air-Line Railroad at 9:15 o'clock of this day.

The plaintiff says that the Georgia train that went down. was the 9 o'clock passenger train. George says this train.

v 74-39

left at 8:45, very close, and McGhee says it passed the yard about 9:30 o'clock; Rose, that it left about 8:50.

So, from the movements of these trains, engines and cars, and the circumstances connected therewith, considered apart from the direct evidence, it would be difficult to decide which train, engine or car injured the plaintiff. But assuming that the injury is proved to have been done by the defendant's engine or cars, and that the burden of showing the exercise of all ordinary and reasonable care and diligence to avoid the injury, is cast on the defendant, and there is some slight testimony (the plaintiff's alone) of the want of proper lights on the engine or cars, and of too rapid a speed in the running thereof, yet we think the testimony of the plaintiff is so confused as to be of but little value. Be this as it may, however, according to the record, we think the plaintiff's injury was the result of his own negligence, and that he could have avoided it by the exercise of ordinary care. What occasion, necessity or excuse was there for the plaintiff to go upon this railroad yard at the time and under the circumstances then existing? None whatever. There were several good streets leading to his home,—Decatur street, and a street next to the cemetery, one of them on each side of this railroad, and immediately adjacent to it, running parallel therewith, and also Hunter or Fair street, all well lighted with gas, and provided with good foot-ways, all leading to his home, and making access thereto easy and pleasant. It was, perhaps, a nearer or more convenient way down the railroad track, but this is no excuse for voluntary peril. The plaintiff left a convenient and well-lighted way, especially provided for him and the general public, and undertook to go at night, without lights, down the space between the railroad tracks, a place in itself a place of danger, only eight feet in width, and over which the head-blocks of the engines projected eighteen inches, thus narrowing the way, through which, says one of the plaintiff's witnesses, a man to go safely must walk straight and not stagger,

and even then, he would be in danger of being scalded by hot water and steam emitted from ˎpassing engines. He went, under the belief, at least, that placards had been posted there, ˏwarning the public to keep away, knowingly and recklessly into danger, in the darkness, when he was, perhaps, to some extent intoxicated, and where, except in a narrow space between the two main lines, "it was rough walking," where there were eight railroad tracks, over which·engines and cars were constantly shifting to and fro, this yard being the place of the main delivery of cars to the Georgia Railroad, the Air-Line Railroad and the West Point Railroad, and got upon the track in the dark-ness, at the very time when he says he knew this engine and cars of the defendant were due at that switch.

"No person shall recover damage from a railroad com-pany for·injury to himself, where the same is caused by his own negligence."

"If the plaintiff, by. ordinary care, could have avoided the consequences to himself, caused by the defendant's negligence, he is not entitled to recover." Code, §§3034, 2972; *The Georgia Railroad and Banking Co. vs. Neely*, 56 *Ga.*, 540; *Lavier vs. The Central Railroad Co.*, 71 *Ga.*, 222. This case approves *Neely's* case· and declares that case to be the law of this state. *Savannah, Florida and Western Railroad vs. Stewart*, 71 *Ga.*, 439; *Macon and Western Railroad vs. Johnson,·* 38 *Ga.*, pp. 409, 432. This case contains a clear statement of the rule by McCay, J. The plaintiff's husband stood on the rear platform of the passenger car whilst it was standing still, and there re-mained until a freight train ran into .it and killed him; and in this case, as well as in the one now under consid-eration, the party's negligence, or want of ordinary care, consisted in his going where he had no business to go, and in voluntarily putting himself in a place of danger. This court properly held the rule applicable to the facts of the case. So in *Higgins vs. Cherokee Railroad,·* 73 *Ga.*, 149, head-note 9, the plaintiff voluntarily got on an open flat

car when there was a passenger coach attached to the train, and got a cinder or spark in his eye, which he claimed destroyed his sight: Held, that he was not entitled to recover, though there may have been some slight negligence on the part of the defendant; and further, that the case ought to have been non-suited.

So, in the *Central Railroad Co. vs. Dixon*, 42 *Ga.*, 327, where the plaintiff was injured by the starting of the cars, as he was passing under them after dark, while they were temporarily stopped to take in wood and water, it was held, under this rule, he could not recover, though the engineer gave no signal for the starting of the train. This case is well in point, and illustrates the rule that no one has the right to recover damages where he voluntarily and rashly goes into danger, in the dark, though there may be some slight negligence on the part of the defendant.

So, in *Southwestern Railroad Co. vs. Johnson*, 60 *Ga.*, 668, where the plaintiff's husband was lying on the track when he was killed, it was held that she could not, because of this rule, recover, even though the defendant may not have blown the whistle at the proper time at the crossing of a public road.

So, in *Georgia Railroad Co. vs. Thomas*, 68 *Ga.*, 744, where the plaintiff's horse was frightened by the blowing of the whistle and he was thrown to the ground and injured, and where it was claimed he was riding a horse known to be afraid of the cars and on an insecure saddle, this court held that the three grounds of defence allowed to railroad companies in cases of injuries to personal property laid down in *Neely's* case in 56 *Georgia*, and which were as follows: first, that the plaintiff consented to the injury; second, that he caused it solely by his own negligence; third, that the defendant, by its agents, exercised all ordinary care and diligence,—did not submit fully the defendant's case, and that the court ought to have gone further and charged that, if the conduct of Thomas was not that of a prudent man, and if he could, by the exercise of

ordinary diligence, have avoided the injury, he was not entitled to recover. See also *Hankerson's* case, 61 *Ga.*, 114; and *Berry's* case, 72 *Ga.*, 137.

That portion of the charge of the court below, in reference to ringing the bell when approaching public crossings, was not applicable to the facts of this case.[*] See *Holmes vs. C. R. R.*, 37 *Ga.*, p. 596. But, considered altogether, the charge was quite as favorable to the defendant as it ought to have been.

We decide this case on the record as it is now presented to us. It may be that additional evidence can be produced on a rehearing of the case that may remove the difficulties that now surround it. It must be borne in mind that the law of contributory negligence is of force in this state. It is carefully reviewed by Jackson, C. J., in the case of *The Savannah, Florida and Western Railway vs. Stewart*, 71 *Ga.*, 446, and by Hall, J., in the same case, p. 439, and in the case of *The Central Railroad vs. Brinson*, 70 *Ga.*, 222. This doctrine does not apply to cases where the plaintiff's own negligence is the sole cause of the injury, or where, by the exercise of ordinary care, he could have avoided the consequences to himself caused by the defendant's negligence. To use the terse and accurate language of Lord Ellenborough, in the case of Butterfield *vs.* Forrester, 11 East, p. 60, " One person being in fault will not dispense with another's using ordinary care for himself." And in Bridge *vs.* Grand Junction Railway Company, 3 M. & W., 248, it is said, " The rule of law is laid down with perfect correctness in the case of Butter-

---

[*]The sixteenth ground of the motion for a new trial complained of the following charge: "In determining whether the agents of the company exercised such care and diligence, you will look to the evidence. If they were going at a greater rate of speed than was accorded by the ordinance of the city, if within the city limits, or if they were within four hundred yards of a public crossing, and were not ringing the bell of the engine as required by the law, or if they failed to have signal lights or persons to look for danger, or if they failed to have head lights, if the exercise of ordinary and reasonable care and diligence required these things, all these would be circumstances, if they are shown to exist by the evidence, that ought to be considered by you in determining whether the defendant's agents exercised all ordinary and reasonable care and diligence."

field *vs.* Forrester; and that rule is, that, although there may have been negligence on the part of the plaintiff, yet, unless he might, by the exercise of ordinary care, have avoided the consequences of the defendant's negligence, he is entitled to recover; if by ordinary care he might have avoided them, he is the author of his own wrong." These cases were followed and made the basis of the opinion of this court in *Branan vs. May*, 17 *Ga.*, 136, and doubtless that case, as well as its citations, were duly considered by our codifiers in drafting sections 2972 and 3034 of the Code

Judgment reversed.