THE CENTRAL RAILROAD AND BANKING CO. *v.* DENSON.

Although one injured by the negligence of a railroad company might, by the use of ordinary care, have avoided the consequences of that negligence, yet if it were so gross as to amount to wanton and wilful negligence, such want of ordinary care to avoid the consequences of it would be no bar to a recovery for the injury. Such a case is presented where it clearly appears that the injured one, who was very deaf though able to hear to some extent, walked on the railroad track in daylight; a train came from behind him, and the company's servants could have seen him for 400 yards before reaching him, but though he was between the blow-post and the crossing, they gave no warning by blowing the whistle or ringing the bell or otherwise, and made no effort to check speed until within a few feet of him, when the whistle was blown twice, and he was struck by the train about the same time.

SIMMONS, J., dissenting.

July 7, 1890.

Negligence. Railroads. Before Judge HARRIS. City Court of Macon. June term, 1889.

Reported in the opinions.

R. F. LYON, for plaintiff in error, cited 2 Am. and Eng. R. Cas. 124; 4 *Id.* 569; 6 *Id.* 5; 8 *Id.* 217, 220; 10 *Id.* 727; 12 *Id.* 64, 77; 19 *Id.* 98; 34 *Id.* 37, 40; 37 *Id.* 288, 292; 75 Mo. 575; 55 Ill. 386; 2 Thomp. Tr. 1803; 78 *Ga.* 694.

M. G. BAYNE and DESSAU & BARTLETT, *contra*, cited 5 S. E. Rep. 577; 6 *Id.* 77; 7 *Id.* 515; 99 N. C. 298; 6 Am. St. Rep. 521; 4 *Id.* 507; 45 Ohio St. 11; 92

N. Y. 289; 35 *Id.* 9; 112 Ind. 59; 113 *Id.* 196; 60 *Ga.*
339; 70 *Ga.* 207; 74 *Ga.* 857; 82 *Ga.* 190, 400; 83 *Ga.*
266.

Blandford, Justice.

Martha Denson alleged that the Central Railroad and
Banking Company killed her husband, Jackson Denson,
by the careless running of its trains, without any fault
or negligence on his part; that he was killed by the
gross negligence of the agents of said company, and
that the same could have been avoided by ordinary care
and diligence on their part; and that he was run over
without any attempt on their part to avoid it. She had
a verdict in her favor. The railroad company moved
for a new trial on several grounds, and the refusal to
grant a new trial is alleged as error. The evidence in
the case shows that Jackson Denson, the deceased, was
afflicted with deafness, in fact was very deaf, although he
could hear to some extent; that he went on the track
of the railroad company about five o'clock in the morn-
ing; a train was coming behind him, but he continued
to walk steadily forward. There was no warning given
of the approach of the train, no blowing of the whistle
or ringing of the bell, and no attempt was made to
check the train until it was within a few feet of the
deceased, when the whistle was blown twice. About
the same time the train collided with the deceased, and
he was immediately killed.

The code, §2972, declares: "If the plaintiff by
ordinary care could have avoided the consequences to
himself caused by the defendant's negligence, he is not
entitled to recover. But in other cases the defendant
is not relieved, although the plaintiff may in some way
have contributed to the injury sustained." The ques-
tion here is, what does "the defendant's negligence"
mean? Is it not apparent that it is the opposite of the

ordinary care required of the plaintiff, and the want of reasonable and ordinary care required of defendant— such neglect as amounts to gross, wilful and culpable neglect? We are of the opinion that the word negligence as used in this section of the code does not mean gross negligence, wilful and culpable negligence; but in this case we are of the opinion that the defendant was guilty of gross, wilful and culpable negligence, from the evidence submitted. There was not even an effort on the part of the railroad company in the court below to show that any steps were taken to save this man's life when it became apparent to the company's servants that his life was in great peril and jeopardy. It appears to us that this negligence on the part of the plaintiff in error was a wanton act, showing an utter disregard for human life. It is manifest that an individual who would commit a homicide under such circumstances would be guilty of the crime of murder. One of the objects of government is to protect individuals in the enjoyment of life and limb (Constitution, art. 1, sec. 1, par. 3, 4, Code, §4995); and surely it cannot be said that a corporation or artificial person can be licensed to wholly disregard human life. The negligence of the plaintiff will not bar a recovery where it affirmatively appears that the negligence of the defendant is so gross as to lead to the conclusion that the same is wilful and culpable. To this effect are many decisions of the courts of England and this country. In Rorer on Railroads it is laid down as the law that "At places other than crossings or in public highways, a railroad track is the private property of the company, and no one other than the company's servants or employés, in the necessary discharge of duties there, have any right to be thereon; and more especially so as to their using the same as a thoroughfare or pathway on which to walk or travel; and though the company

may not wantonly injure persons thus intruding upon and using the same, yet if the person be an adult, not known to those in charge of the train to be deficient in discretion, or in physical ability to take care of himself, or not known to be deficient in his faculty of hearing, and not in any way presenting indications of being disabled or incapable of taking care for his safety, then the persons in charge of the train have a right to conclude and to act on that conclusion that such person is in possession of all his proper faculties to enable him to do so, and will leave the track in time to save himself from injury, and are not bound to stop or check up the train on his account; but *as a matter of ordinary prudence and care, it is their duty to sound the whistle and ring the bell as a warning of the approaching danger.*" 2 Rorer Railroads, 1122; Finlayson *v.* C. B. & Q. R. Co., 1 Dill. C. C. R. 579. See also Shearman & Redfield on Neg. §§480-482.

In the case of Baumeister *v.* Grand Rapids & I. R. Co., 30 N. W. Rep. 337, the Supreme Court of Michigan say that "if the deceased had stood still and faced the train as it approached him, it would furnish no excuse to the defendant for running its engine over him and killing him. If the engineer saw he did not intend to get off the track, and there was time enough to stop the train, contributory negligence cannot be relied upon in such a case. Neither can it in any case where the action of the defendant is wanton, wilful or reckless in the premises, and injury ensues as the result." And many authorities are cited in support of this proposition, among them 2 Thomp. Neg. 1160 ; Cooley Torts, 674 ; Beach Contrib. Neg. 29, etc. In the case cited warning was given, but as it appeared that the servants of the company had time to stop the train to prevent the accident, it was held that the plaintiff was entitled to recover. In the present case it appears that it was

daylight when the train approached the deceased, and that the company's servants could have seen him for 400 yards before they reached him. Yet when they discovered he was walking on the track, they gave no note of warning. Such conduct cannot be held to be anything else than wanton and wilful negligence.

In Pennsylvania Co. v. Sinclair, 62 Ind. 301, it was decided that "where an intent, either actual or constructive, to commit an injury, exists at the time of its commission, such injury ceases to be a merely negligent act, and becomes one of violence or aggression. Contributory negligence is a complete defence to an action for damages for a merely negligent injury." But where the injury complained of is in terms or substance wilfully committed, then contributory negligence ceases to be a defence. We think this is a proper statement of the law.

So we conclude that notwithstanding the party injured might, by the use of ordinary care, have avoided the consequences of the defendant's negligence to himself, yet where that negligence is so gross as to amount to wanton and wilful negligence, the want of ordinary care on his part to avoid the consequences of the defendant's negligence would be no bar to a recovery for the injury so received.

We have examined the assignments of error as to the instructions of the court to the jury, etc., and we do not think, under the view we take of the case, that the court committed any material error.

*Judgment affirmed.*

BLECKLEY, Chief Justice, concurring.

Denson was 27 years of age, a laboring man earning wages at the rate of $10.00 a month, besides rations, house-rent and fuel. His expectancy of life was 36.41 years, and the verdict of the jury in favor of his

widow was for $1,000.00.   He was killed in July,
1888.   According to the evidence, he was very deaf,
but could hear the whistle of a railroad locomotive;
he had been observed to look up and give attention
when the whistle was blown.   He resided near the
railroad, and was killed within ten minutes after
leaving his home.   It was after sun-up in the morn-
ing, and he was walking along a path upon the rail-
road track which had been in constant use by the
public for 12 or 15 years, some 200 persons or more
passing over it daily.   One witness testified that there
was scarcely any time of day that people would not be
met passing along it.   The morning was very foggy;
the fog was remarkably heavy, but not so thick as that
Denson could not be seen; two persons who happened
to be near saw him when the train struck him, one
being about 100 yards from him, and the other 55 or
60 yards.   Ordinarily, a man in his position on the
track could have been seen by the engineer over 600
yards.   When killed, Denson was 39⅔ yards nearer
to a public crossing than the point at which the "blow-
post" stood (or should have stood were the statute
complied with), at which point the engineer was com-
manded by the statute, on pain of indictment and pun-
ishment (Code, §§708, 710), to blow the whistle of the
locomotive and check the speed of the train, and then
to keep blowing and checking until the crossing should
be reached.   The speed of trains was generally slack-
ened at this point, but on this occasion the train was
some two hours behind time and was running very
rapidly, faster than was usual with freight-trains.   On
reaching the position of the blow-post, neither requisite
of the statute was complied with; the speed was not
checked nor the whistle blown.   Nothing whatever
was done except that, just as the locomotive overtook
and struck Denson, the whistle was blown twice; and

though he was thrown up into the air, the train rushed on without stopping or, so far as appears, attempting to stop. There was evidence that the train was a long one, had no air-brakes and could not have been stopped within a less distance than 200 yards; but there was also evidence that if the whistle had been blown at the blow-post and Denson had heard it, he would have had time to get off the track before the train reached him. No train was due or in sight when he stepped upon the track and began to walk along the path.

That there was negligence on both sides is manifest. To take the most favorable view of the law in behalf of the company, the controlling question in the case upon its substantial merits is, whether the facts proved by the plaintiff, and the failure of the company to make any explanation whatever, would warrant the jury in drawing the inference that the negligence of the company was so gross as to amount to wantonness or recklessness on the part of its servants, by whose negligence, in connection with his own, the husband of the plaintiff lost his life. This much is certain, that the train was being run in an unlawful manner; it could not be lawfully run from the blow-post to the public crossing, over that part of the track upon which this man was walking, without blowing the whistle and checking the speed. When the engine arrived at the blow-post, the engineer, if he was giving any attention to his duties, must have seen Denson, who was then less than 40 yards distant. He must have seen him, for two other persons, one of them 100 yards, the other between 55 and 60 yards distant, did see him at that moment, or within a second or two afterwards. Besides the command of the law, there was this close proximity of the engineer and his engine to a man upon the track to prompt him to blow the whistle. Not to blow it was simultaneously to defy the law and endanger life. It

was a foggy morning, and the dampness of the atmosphere being favorable to conducting sound, there is a strong probability that the engineer could have saved a human life by a mere movement of his hand. Might not the jury rationally conclude that not to perform so simple an action in such an emergency was gross negligence of the most aggravated kind known to law? It is said that the engineer, seeing a grown man walking ahead of him on the track, and not knowing that he labored under any infirmity, had a right to assume that he would get off in time to save himself; and cases are numerous which justify that sort of assumption to cover omissions to check or stop the train, and to cover delay in giving signals, where the occasion for doing one or both of these things is governed alone by the presence of a man on the track, and is not affected by statutory requirements in addition to such presence. But here the breach of a statutory duty is unquestionable, and there is no evidence that the engineer was ignorant of the man's infirmity, or that he made any assumption whatever as to his probable conduct. After it was proved that the engineer committed a homicide whilst in the commission of an unlawful act, or of a lawful act which probably might produce such a consequence in an unlawful manner, why should the jury volunteer to make any assumption for him, when he is not produced to explain his conduct, nor his absence accounted for? A peculiar circumstance which distinguishes this from most cases otherwise similar is that, in this instance, there was an express command of the law to blow the whistle at that particular place, whether anybody was on the track or not. For the engineer to make any assumption as a reason for not blowing, would be to violate the statute and leave the violation to be justified by an assumption. Moreover, the jury might consider it as further evidence of recklessness that the train was

run at high speed, through heavy fog, where there was a path upon the track used daily by hundreds of persons and known to be so used; I say known, because a use so frequent and continuous for a dozen or more years could hardly fail to be attended with such knowledge on the part of the company and those of its employés who were engaged in running trains over that portion of its line. The more dense the fog, the more rash would it be to rush headlong over a part of the road where people were accustomed to walk at all hours of the day, without giving any note of warning though the train was out of its usual time. Another fact to which the jury could look as evincing a spirit of recklessness was that, though a human being was mortally wounded by a blow from the engine which threw his body "up above the smoke-stack," the train made no stop but continued on its way as if nothing had happened. The circumstances indicate decisively that the engineer could not have been ignorant of the grave mischief which he had done. The omission of the company to explain any of his conduct left the jury free to put upon all parts of that conduct, involving, as some of it did, a clear violation of statutory duty and the commission of an indictable offence, the most unfavorable construction; and so treating it, the homicide could well be attributed to negligence so gross as to be equivalent to wilful and wanton destruction of life. Grant that the deceased, also, was guilty of gross negligence in not foreseeing the danger and guarding against it, yet he did not thereby forfeit his life and render it lawful to kill him. Against liability for mere negligence resulting in injury or death, the failure of the suffering party in ordinary care, where the disaster could have been shunned by the exercise of such care on his part, will be a defence; but wilful or wanton torts cannot be defended by showing that the victim

was a wrong-doer and that he recklessly exposed his own life. One reckless man cannot kill another and justify himself to the law by the plea that the other was in his way and might have kept out, or gotten out, if he had tried. Human life is too sacred for the law to recog-- nize this as a good answer. Cook *v.* Central Railroad 67 Ala. 533 ; *Central R. Co.* v. *Brinson,* 70 *Ga.* 207. There can scarcely be a doubt that for every criminal homicide of a husband, the wife has a right of action. The code, §2971, is broad enough in its terms to com- prehend every case of wrongful homicide; but let it be confined, as has been done in some instances, to criminal homicides, and the present case may fairly be consid- ered within its provisions. The evidence in the record, unanswered and unexplained, would authorize a jury to convict the engineer of manslaughter, if not of mur- der, provided there was a blow-post where there should have been one. And if there was none, the case would be no better for the company, since the statute (Code, §§708, 709) required it to have one, and declared the superintendent subject to indictment and fine for its absence. The evidence is that in point of fact there was a post, which one of the witnesses says was a "blow- post," adding that it was the "yard-limits post."

Tested by the authority of cases heretofore decided by this court, it will be found that whilst none of them are precisely in point, their general spirit is more con- sistent with upholding this verdict than with setting it aside. *A. & S. R. Co.* v. *McElmurry,* 24 *Ga.* 75 ; *Cen- tral R. Co.* v. *Glass,* 60 *Ga.* 442. In *W. & A. R. Co.* v. *Meigs,* 74 *Ga.* 857, it was ruled that to avoid injuring a trespasser upon the track of a railway, the company's servants are required to use a degree of care which amounts to more than the mere absence of wantonness, malice, or a reckless disregard of another's safety. In that case the crossing had been passed, and the injury

was inflicted several hundred feet beyond. In *Georgia R. R.* v. *Williams, Id.* 723, the injury occurred 150 or 200 yards beyond the crossing. There was a recovery in both of these cases, and neither of them was as strong for the plaintiff as the present, for in neither was the engineer actually engaged in the commission of a misdemeanor or any act in itself illegal at the moment when the injury was inflicted. In the former the evidence was not reviewed, and no opinion was expressed by this court as to its sufficiency to uphold the verdict; but in the latter the evidence was reviewed, and a majority of the court considered it sufficient, putting the decision upon failure to comply with the statute by blowing and checking until the crossing was reached, although no injury happened until after the crossing had been passed and the duty to blow and check had ceased. In *Central R. R.* v. *Smith,* 78 *Ga.* 694, and *Smith* v. *Central R. R.,* 82 *Ga.* 801, the same case, the injury was at a shorter distance beyond the crossing, only 65 or 70 yards, but it occurred before daylight in the morning, and at the first trial there was direct evidence that Smith was not seen by the persons on the engine. At the second trial, though the plaintiff was himself a witness, no reason appeared why he did not discover the approach of the train. None of his faculties were deficient, and his own witnesses testified that the train made a great noise as it ran, both in entering Jonesboro, in which town the accident occurred, and in passing through it. This court held that, no reason appearing why he could not protect himself against the negligence of which he complained, the plaintiff could not recover, and that a nonsuit at the second trial was properly granted. Had he shown that he was partially deaf, and on that account stood specially in need of the statutory signal, still the case would not have been as strong as the present, for he was not injured until

the misdemeanor committed by the engineer was no longer in progress, whilst, as before observed, this engineer, when he killed Denson, was in the very act of perpetrating an offence against the penal law. By abstaining from the violation of law in which he was engaged, he would most probably have avoided the sacrifice of a human life. Nor, in Smith's case, were the other circumstances of recklessness present which we have pointed out in this. The hour was not one at which movement of the public over the track was to be expected; nor was a man, seen by the engineer, stricken and knowingly left to his fate as if nothing serious had occurred. It is manifest that some, at least, of the marks of criminal homicide apparent in this case were absent from that, besides the great fact that in that case no homicide was committed. The same may be said of Central R. R. v. Raiford, 82 Ga. 400, in which case the engineer and fireman were examined to negative wantonness. Of the numerous cases holding that failure in ordinary care by the injured party defeats recovery, not one, so far as I know, applies the rule to an instance in which the jury might fairly infer recklessness equivalent to wilful tort. Compare Holmes v. Central R. Co., 37 Ga. 593; M. & W. R. Co. v. Johnson, 38 Ga. 409; S. W. R. Co. v. Johnson, 60 Ga. 667; S. W. R. Co. v. Hankerson, 61 Ga. 114; S. F. & W. R. Co. v. Stewart, 71 Ga. 427; Berry v. N. E. R. Co., 72 Ga. 137; W. & A. R. Co. v. Bloomingdale, 74 Ga. 604. As for Sims v. M. & W. R. Co., 28 Ga. 93, it wants two essential elements to render it a fit precedent to be followed in ruling the question now before us. There was nothing but the man on the track to render it incumbent on the engineer to give a signal, and a signal was actually given in ample time to admit of his escape from the track if he was awake. Here, on the contrary, the law commanded the signal at a particular point, and it was not given at all

v 84-50

at that point, but was delayed without the shadow of an excuse for it, legal or moral, until it was too late. When, at last, the whistle sounded its two blasts, they must have rung in the victim's ears, if he heard them, more like shouts of victory than notes of warning. They were in time to announce his death, but not to aid in preserving his life.

I concur in the judgment of affirmance. Frazer *v.* S. & N. Ala. R. Co., 81 Ala. 185, 1 So. Rep. 85; 1 Thomp. Negl. 448, notes, §1; 2 *Ib.* 1146, notes, §1 to §18; 2 Rorer R. R. 1122 *et seq.*; Beach Contrib. Negl. §§67, 68; 2 Beach Law Railways, §970; 2 Shear. & Red. on Negl. §480 *et seq.*; 2 Wood's Ry. Law, §320; Whart. Negl. §388.

Simmons, J., dissented without written opinion.