25972, 25973. DODSON, administrator, *v.* SOUTHERN RAILWAY COMPANY; and *vice versa.*

DECIDED MARCH 5, 1937.

*Mundy & Mundy, Wright & Covington,* for plaintiff.

*Maddox, Matthews & Owens,* for defendant.

SUTTON, J.   W. H. Dodson, as administrator of the estate of Edgar Samuel Waddell, brought suit against the Southern Railway Company for damages on account of the homicide of the deceased which was alleged to have been caused by the negligence of the defendant in operating its train within the City of Rome. It was alleged that at the time of his death the deceased was twenty years of age, unmarried; that his mother was not in life; that his father was living but not dependent upon the deceased for support; that the plaintiff was the uncle of the deceased, dependent upon him for support, and had received from him $30 per month; that the deceased had a sister, Beatrice Waddell, sixteen years of age, who because of mental incapacity was unable to work or perform any labor, and that she was dependent upon the said brother for support and that before his death he contributed to her support $10 per week.   The defendant filed an answer, also general and special demurrers raising the question whether or not the plaintiff was entitled to maintain the suit, and alleging that no cause of action was set forth.   The plaintiff amended his petition by striking the allegations as to his dependency individually upon the deceased for support, leaving the suit to proceed in his name as administrator of the estate of the deceased, for the benefit of Beatrice Waddell, it being added by the amendment that the father of the deceased was confined in the chain-gang at the time of the son's death, and had long theretofore abandoned the son and had not contributed to his support, and had not received any support from the son, and was not dependent upon the son for support.   The court overruled the demurrers, and the defendant excepted pendente lite.

On the trial the evidence was substantially as follows:   The plaintiff was duly appointed administrator of the estate of Edgar Samuel Waddell, who died on July 29, 1934, from injuries inflicted by the defendant's train.   His mother died when he was

six years of age; his father was in life, but was not dependent on him for support, and received no support from him. The deceased and his sister, Beatrice Waddell, were reared by the plaintiff and his wife from the time of the death of the mother of the children. At the time of the death of Waddell his sister was dependent on and received support from him, she being subnormal mentally and physically and incapable of supporting herself. He was an able-bodied young man, lacking two months of being twenty-one years of age, and was accustomed to make $3 per day. About midnight on July 28, 1934, he was found between the main line and a switch-track of the defendant, fatally injured and in an unconscious condition, his head being somewhat between two of the cross-ties or up against one, as variously testified to by several witnesses, his body extending in a slanting position. There was blood and some hair at or on one of the cross-ties, and, according to the testimony of one or two witnesses, a slight portion of brains. His skull was fractured on the left side and mashed in with a gash about five inches long, there being abrasions along his left arm and on the left side of his back. He was bleeding from his nose and ears, his shirt being torn loose, and there being blood on his clothes. There was no evidence of his body having been dragged. He was taken to a hospital where he died a few hours later. The doctor testified that in his opinion the injuries could have been inflicted by any severe blow or blows. Waddell was last seen alive and conscious by Mrs. Nora Stanford, who lived about one hundred yards from a crossing below which his body was found. She testified that he came to her home between 9:30 and 10:00 p. m., on the date of his injury, according to her recollection, asking for her daughter, and stating, "We are getting up a crowd to go to the dance in the country." He was informed that she was not at home. He was in full possession of his mental faculties, and appeared to be perfectly normal; he was there only briefly; and she saw him leave in the direction of the railroad. This witness lived on Stephens Street, which proceeds down to the railroad; but automobiles and other vehicles can not continue across the railroad, because it is elevated, and in order for persons on foot to go across it is necessary that they mount a kind of steps made of cross-ties. It was below this crossing, at a distance of about one hundred yards, that the body of the deceased

was found after he left the home of Mrs. Stanford. She further testified:

"It wasn't so long after he left my house that the train ran. To my best knowledge it wasn't twenty minutes, or may be ten, . . and when the train come down I didn't look up, I had my head in the window [while lying on a bed, reading], and it was open, and it come on down and blowed between the—all of them blow between the—there is a cooperage factory and casket factory along there, and they blow from there on down to the crossing [a crossing further down the railroad and near the depot]; all of them do. After they cross Stephens Street, there is a little path across there; and they blow from there to the crossing. The train was making much fuss. I don't know how fast it was going, or approximately how fast; at about fifty-five miles or more than that, or may be less; more than six miles an hour. It is a kind of drop off, and they come down empty, and they come down there awful fast. I would say that Edgar had just time enough to get down there when the train ran, to the best of my knowledge. In my judgment, when I heard the train blow it was passing Stephens Street crossing. . . I didn't hear any bell ringing; if there had been any bell ringing, I couldn't hear it for the whistle blowing. . . This train on this particular night came from around this curve from Chattanooga, from the north. I couldn't say, in making that curve, where the lights of the locomotive shine, but in turning a curve an automobile light goes over to the side from the road, but when you get straight the lights show the road. The lights wouldn't shine down the track until the locomotive got straight with the track. I have seen trains come around that curve. The light kind of goes up, and when it gets even with the curve the lights shine around the curve just like automobiles; the light does not go around with the curve. . . I have heard those trains run day and night, because we were so close to them. . . My house sits back between the railroad and Calhoun Avenue on Stephens Street, and is about a hundred yards from the track. . . I didn't see the train. . . I was reading. I don't know how much time elapsed from the time Edgar left my house until the train came. . . I would be afraid to give you my estimate of that time; I don't know; when you are reading your mind is on it and you don't know, you get

interested in your reading and you don't know about the time. Later in the night I heard the train coming down. It was early. I hadn't finished my story after he left. It was not approximately a half hour. It could have been around twenty to thirty minutes that the train come down. . . I didn't see that train. I paid no particular attention to it. I have nothing to base my estimate on as to the speed it was making. . . When I said fifty-five miles an hour, it was naturally a guess; you don't know, but I heard the train. . . . It was running mighty fast. I have seen trains going by there at a high rate of speed, and heard the noise at the same time. I have seen them going slowly and heard the noise. When they are running slow they do not pop the rails, and run steadily, but when they are empty and running fast, they pop, and you can hear them a long time; the trains run so fast that they pop the rails, and the trains blow from there to the crossing, and that drowns out the noise. . . This curve in the track curves around behind my house, and I can hear that train behind my house. . . Back up the railroad there are two signal-lights on the curve, and after they get around that curve you can hear the trains. In the daytime you hear the train before it comes around the curve, but at night you don't pay attention to it. I hear them better at night if I am paying attention than in the daytime. A train can be heard before it comes around the curve, especially as fast as it was running and popping the tracks."

In evidence was an ordinance of the City of Rome, declaring: "The running of trains and engines on all railroads within the city limits shall not at any time be at a greater rate of speed than six miles an hour, and not over four miles an hour at street crossings. They shall give ample notice to all persons of their approach by tolling or ringing their bells, so as to afford all reasonable opportunity to avoid collisions or accidents."

At the conclusion of the evidence a motion for nonsuit was granted, and the plaintiff excepted. The defendant by cross-bill of exceptions assigned error on the overruling of its demurrers.

1. "The mere fact that the public may have been accustomed to travel on foot along a certain portion of the right of way of a railway company, and that no measures have been taken to prevent it, does not of itself constitute a person so using the track a

licensee of the company; and in the absence of the company's permission for such use, such unauthorized custom does not change the relation of one so using the property of the railway company from that of a trespasser." *Hammontree* v. *Southern Railway Co.*, 45 *Ga. App.* 728 (165 S. E. 913); *Southern Railway Co.* v. *Barfield*, 112 *Ga.* 181 (37 S. E. 386).

2. "The mere failure of the employees of a railway company to discover the presence of a trespasser at a place where and a time when it was their duty to anticipate the presence of trespassers, and thereafter to take such needful and proper measures for his protection as ordinary care might require, might amount to a lack of ordinary care on the part of the railway company, but would not, in and of itself, amount to wilful and wanton misconduct." *Hammontree* v. *Southern Railway Co.*, supra; *Lowe* v. *Payne*, 156 *Ga.* 312 (118 S. E. 924).

3. "What amounts to a qualification of this rule is that if the presence of the trespasser on the track at the time and place of the injury is brought about by such peculiar facts and circumstances as would free him from guilt of a lack of ordinary care in thus exposing himself, the company would then be liable for a mere lack of ordinary care on its part in failing to anticipate his presence at a time when and a place where it was charged with such duty, and in thereafter failing to take such precautions for his safety as might seem reasonable." *Hammontree* v. *Southern Railway Co.*, supra, citing *Atlantic Coast Line R. Co.* v. *Fulford*, 159 *Ga.* 812 (127 S. E. 274); *Parish* v. *Western & Atlantic R. Co.*, 102 *Ga.* 285 (29 S. E. 715, 40 L. R. A. 364); *Fairburn & Atlanta Ry. Co.* v. *Latham*, 26 *Ga. App.* 698 (107 S. E. 88); *Georgia Railroad & Banking Co.* v. *Dawson*, 37 *Ga. App.* 542 (141 S. E. 57).

4. "Ordinarily the only duty owing by a railway company to a trespasser upon or about its property is not to wantonly or wilfully injure him after his presence has been discovered." *Hammontree* v. *Southern Railway Co.*, supra; *Young* v. *South Georgia Railway Co.*, 34 *Ga. App.* 537 (130 S. E. 542); *Central of Georgia Ry. Co.* v. *Stamps*, 48 *Ga. App.* 309 (3) (172 S. E. 806); *Ashworth* v. *Southern Ry. Co.*, 116 *Ga.* 635 (43 S. E. 36, 59 L. R. A. 592).

5. "Even where a person on the track is in fact discovered, it

is the general rule that a railway company is authorized to act on the presumption that a person apparently of full age and capacity, standing or walking along or near its track, will leave it in time to save himself, unless it should also appear that such trespasser is in an apparently incapacitated or helpless condition, so that he could not reasonably be expected to extricate himself from his peril." *Hammontree* v. *Southern Railway Co.*, supra; *Young* v. *South Georgia Ry. Co.*, supra.

6. The duty of the railway company to discover the presence of one upon its right of way, when it may reasonably be anticipated that such person may be present thereon, does not relieve him of the duty to exercise ordinary care for his own safety. *Southern Railway Co.* v. *Slaton*, 41 *Ga. App.* 759 (2) (154 S. E. 718); *Leverett* v. *Louisville & Nashville Railroad Co.*, 38 *Ga. App.* 155 (142 S. E. 905); *Atlantic Coast Line R. Co.* v. *Fulford*, 159 *Ga.* 812 (5) (127 S. E. 274).

7. In the absence of wilful and wanton misconduct on the part of the defendant, the plaintiff can not recover for the alleged homicide of the deceased if the latter could, by the exercise of ordinary care, have avoided the consequences of the defendant's negligence. *Lowe* v. *Payne*, and *Central of Georgia Ry. Co.* v. *Stamps*, supra, and cit.

8. Questions of negligence, proximate cause, and failure to exercise ordinary care to avoid the consequences of another's negligence are questions of fact which are ordinarily for determination by a jury under proper instructions from the court as to the applicable principles of law, but in plain and indisputable cases the court may determine them as a matter of law.

9. In a case of simple negligence, where the failure of the person injured to exercise ordinary care is the proximate cause of the injury, it is immaterial whether he is a trespasser or licensee. *Potts* v. *Southern Railway Co.*, 47 *Ga. App.* 268 (170 S. E. 319), and cit.

10. Applying the above principles of law to the facts of the present case, and giving to the evidence introduced by the plaintiff the most favorable construction, that the deceased was struck by the defendant's train while walking longitudinally between its main-line track and a side-track, rather than by an independent force, and at a place where it was the duty of the defendant's

agents while operating the train to anticipate thereon the presence of the deceased, that the defendant's agents were guilty of some negligence, though not amounting to wilful and wanton misconduct, but that the train in rounding a curve blew and continued to blow its whistle at a point one hundred yards from where the deceased was struck, which blowing was heard by a witness equally distant, and that the train was running very rapidly in violation of a city ordinance, and making much noise, that the deceased was a young man lacking only two months of being twenty-one years of age, and was in full possession of his physical and mental faculties, and at the time of the injury was not shown to have become incapacitated or helpless to extricate himself from his dangerous position and avoid being struck by an approaching train, it follows that he was bound to know of his perilous situation and ought to have anticipated that a train might overtake him, and that by merely turning his head in the direction from which the danger might come he could have ascertained by his faculties of sight and hearing that a train was in fact rapidly approaching from his rear, and that by the exercise of ordinary care he could have stepped aside from the rail or track and avoided the consequences of the defendant's negligence. The failure to exercise such ordinary care for his own safety was, as a matter of law, such neglect on his part as to bar a recovery for his death, notwithstanding the negligence, short of wilful and wanton misconduct, of the defendant's agents. See especially *Lowe* v. *Payne, Atlantic Coast Line Railroad Co.* v. *Fulford, Young* v. *South Georgia Railway Co., Leverett* v. *Louisville & Nashville Railroad Co., Potts* v. *Southern Railway Co.,* and *Central of Georgia Ry. Co.* v. *Stamps,* supra. The court did not err in granting a nonsuit.

11. Because of the above ruling, the cross-bill of exceptions is dismissed.

*Judgment affirmed on the main bill of exceptions; cross-bill dismissed. Stephens, P. J., and Felton, J., concur.*