27887. POLLARD, receiver, *v.* TODD.

DECIDED MARCH 15, 1940.

*W. S. Allen, R. M. Arnold,* for plaintiff in error.
*J. P. Atkinson, N. F. Culpepper,* contra.

FELTON, J. Mrs. Mittie Todd brought suit against H. D. Pollard as receiver of the Central of Georgia Railway Company, to recover damages for the death of her husband, Strozier T. Todd, caused by the operation of one of the defendant's trains, as her husband was walking along the railroad-tracks. The plaintiff alleged that her husband came upon the railroad-tracks from a foot-path which led from his home to the railroad right of way; that people customarily walked along the railroad at that point in going from the crossing of a public highway by the railroad to a flag stop, with the consent and approval of the railway company and within the knowledge of the operators of its trains; that when the plaintiff's husband entered upon the railroad-tracks no train was in hearing or in sight; that the view up the track from that point was obstructed by a curve in the track and a deep cut in the right of way about 250 yards from where her husband entered upon the track; that he was walking along the track with his head down; that he was in plain view of the operators of the train for several hundred feet down the track as it approached, going down a long, steep grade, rolling without any brakes on, and making very little noise; that the operators of the train failed to blow or give any warning as it approached the crossing, and failed to blow the whistle or ring the bell or give any warning as it approached the flag stop, or do any other act or thing to attract her husband's attention to the approaching train which was hidden from his view until it rounded the curve and came out from behind the deep cut; that

the train was moving about sixty miles an hour at the time it struck her husband; that the failure of the engineer, after seeing that her husband was in a place of peril and was not aware of the approaching train, to blow the whistle and ring the bell or do anything to attract his attention to the approach of the train, constituted wilful and wanton negligence on the part of the defendant's servants and agents; and that had the engineer or agent of the railroad company given any signal or warning of the approaching train her husband could and would have gotten from the track in front of the train in time to escape being struck thereby. The defendant denied liability, and set up that the plaintiff's husband was a trespasser at the time and place, and that the only duty which those in charge of the operation of the train owed him was not to wilfully and wantonly injure him after they actually discovered his presence on the track, and that the servants of the railroad company were not guilty of any wilful or wanton act which in fact would cause or contribute to his death. The jury returned a verdict for the plaintiff. The only exception insisted on is to the judgment overruling the general grounds of the defendant's motion for new trial.

The following appears from the evidence: Strozier T. Todd was the husband of Mrs. Mittie Todd. About 6 p. m. on Sunday afternoon, May 22, 1938, he was struck and killed by a passenger-train which was operated at the time by the defendant and was traveling "pretty fast." The accident occurred near what had been Allie Station in Meriwether County. There had once been a depot at Allie, but it had long since been abandoned and removed, and there was left to designate the station only a signboard with the word "Allie" written on it. At Allie there is a main line and a side-track which extend in the general direction north and south; but as they pass the station sign these tracks are on a curve. Proceeding south the curve is to the right. The main line is east of the side-track. About one mile north of Allie is a station signal. At a point 418 feet north of Allie Station is a crossing where the Hogansville public road crosses the main line and side-track. South of the Allie Station sign is a railroad telephone booth. The station sign and the booth are east of the main line. South of Allie Station and south of the telephone booth is a switch point where the side-track joins the main line. The Hogansville public road

is 507 feet north of the telephone booth, and 943 feet north of the switch point. The station sign is 89 feet north of the telephone booth, and 525 feet north of the switch point. The telephone booth is 436 feet north of the switch point. Mr. Todd left his home in the afternoon, proceeded across the field and pasture, and entered the main-line track about where the switch point south of Allie is located. He was walking north between the rails on the main-line track when he was struck and killed by a passenger-train which was proceeding south on the main-line track. He was knocked off the track, and was lying between the main line and the side-track when picked up. Witnesses testified that people were accustomed to use the pathway and the track between the switch point and Allie Station, for the purpose of going to and from the station. The engineer and fireman and other employees on the train testified, that they had never seen the pathway; that it was not there; that the track between the switch point and the station was not used by pedestrians; that they had never seen any one walking along the track between the switch point and the station until Mr. Todd was seen; and that they did not know of any use by pedestrians of this portion of the track as a pathway.

Worcester Todd, a son of the plaintiff, testified as follows: "1 was standing on a dam looking at some fish playing in the water. The train came, and I didn't hear anything at all until this sharp blowing. I could see the top of the train where I picked him up at. That was where the sharp blowing took place, as near as I could get at it. . . When I got there it was my father that was killed there. Some railroad man with a cap on, flagman or conductor one, came out from the train and told me to push him off the track, and said, 'Then we can back up here; we are already late.' . . We helped to get him off, so the train would have room to back up there where he was at. They backed up, and this trainman got out and said to the engineer, 'Did you see this man?' and he said 'Yes, I saw him when I came around the curve. I thought he would get off the track, and he didn't get off until I got right on him, and I blew the whistle, slammed on the brakes, and ran right into him.' From the curve where the engineer said he first saw the deceased to the point where the train hit him is from 275 to 300 yards. It was right at 300 yards. We stepped it. The train, after hitting him, drug him 50 or 60 yards. I did

not hear the train blow for the station nor for the crossing. The first blowing I heard was the sharp blowing just about where I picked up my father. It did not sound like a crossing blowing nor a station blowing. I made an examination of the track along there. It had something like paper on the rails. I reckon five steps above where it hit him down to where it stopped 250 to 300 yards below there. There was nothing on the rail above there to indicate that the brakes had been applied. There was something there that appeared that the rails had been burned. There was sand or something on the track. It looked like the ties had been burned. That began about five steps above where the train first started to dragging him and went down for about 50 or 60 yards. It went on beyond where I picked up the body, 250 or 300 yards. The substance on the rails began about five feet from where the train hit him, and extended from there to the place where the train stopped. There was not any of that stuff on the rails above where the train hit him. . . I know where the train was when it blew. I could see the top of it and the smoke coming out of it. . . Starting at the curve, I could see where Mr. Todd was hit at. I let somebody walk down there and stand, and I went back to the curve and looked to see how far I could see. . . Mr. Todd walked with his head down all the time, whether on the highway, railroad, or anywhere else. I have seen him walking down the street with his head down." The witness further testified that he was at a dirt dam where there was a spring pond, and that the distance therefrom to the switch point was about 250 yards, and from the switch point to the Hogansville road was about 400 yards, thus making the distance from him to the Hogansville crossing about 650 yards; and that between the dam and the switch point there was a lot of trees, bushes, and things that had grown up around there.

Guy Reeves testified for the plaintiff, in part, as follows: "I was sitting on my porch at the time I saw Mr. Todd was coming. My mother was with me, but she couldn't see. I saw him coming across the pasture. My pasture is right in front of my house. He went out of sight. The next time I saw him, he was on the railroad coming up the track. There was a patch of woods between me and the railroad. I saw Mr. Todd when he went behind these woods, and I saw him just as he came out, and that is when the train hit him, immediately after he stepped from behind those

woods. The first blow of the train I heard was when it tooted for Mr. Todd. I don't know just how close the train was when that happened, but the train, I would say, was within ten feet of him. I couldn't say how fast the train was going. I don't know of any special noise it was making. It is downgrade around the curve. The train was going fast. Pretty fast, I would say. It blew when it got right on him. I immediately jumped and started running down across the field. When I got there, the train was stopped. I think Worcester, his son, and myself were the first ones there. After the train stopped, the flagman or the conductor said: 'Somebody move the body off, so we can back up.' It was right there in that switch, in where the tracks meet there with the switch track. After that the engineer came out. The engineer and the conductor were talking. The conductor asked him if he was late. The engineer told him he was five minutes late. The conductor asked him if he saw the man. He said: 'Yes, I saw him, but I thought he was going to get off.' That was the conversation. The first blowing I heard was just before it struck him. I remember the train blowing for the station. It gave one long blow for the station. After that I don't remember the train blowing for the crossing. I possibly would have heard it had it been blown. I heard it blow for the station and heard it blow toot, toot, toot, when it hit Mr. Todd. . . I heard the train blow the station signal. I don't recall whether it blew the crossing signal. It is possible it would have blown and I not heard it. I am living there and am accustomed to hearing it and pay no attention to it lots of times. I saw the train and I heard it."

Tom Shelton, a witness for the plaintiff, testified: "I heard the train blow. It looked like it was back up in the cut somewhere. The next time I heard the train, it went toot, toot, toot, toot, toot." Mrs. Hattie Reeves testified as follows: "My porch faces the track. From the porch I can see the track in a certain place. I can not see it away down. From where I was sitting this Sunday afternoon I could see the track. I could see the track from my porch to where the depot used to be. When the train began to make that short blow was when I looked around to see what it was. . . When I first heard the train it was making a lot of sharp blasts. That is when I looked around. At that time the last coach was below the telephone booth. It kept blowing and then made one sharp blow."

J. R. Hutchinson testified: "I was sitting on a bench at the porch store. I heard the train coming and heard it blow for the crossing. Immediately after that I heard it blow like a cow was on the track, quick blasts of the whistle." Louise McLaughlin testified: "I heard the train coming. I heard it blow for the crossing. It blew some more, some sharp blows like cows were on the track. I was in the house. . . I heard it blow for the crossing and immediately after that several short blasts. . . It never did stop blowing." Roberta Evans testified: "I heard the train coming. It was blowing. I heard it blow for the crossing. It just kept blowing." Susie Parks testified: "I heard the train blow for the crossing that afternoon. I heard it blow short quick blasts immediately afterwards." Emma Anderson testified: "I heard the train blow for the station and the crossing. After it blew for the crossing it commenced giving these short blows. I heard that. . . It started blowing the short blasts. It started blowing just as it started across the Hogansville crossing." Ludie Anderson testified: "I heard the train blowing for the crossing. Immediately after that I heard some short blasts. I don't know how those short blasts blow. I didn't pay that much attention. I know they sounded. . . 'Toot, toot, toot, toot;' that's the way it went."

The engineer testified that the bell was ringing as the engine approached the crossing; that it was ringing by automatic bell ringer; that it was ringing when the engine struck the plaintiff's husband. He further testified: "As I approached the crossing I was looking ahead at the crossing. The speed of the train was between forty-five and fifty miles per hour. I saw Mr. Todd on the track. I first saw him after I came out of the cut and passed over the crossing. Just as soon as I saw him I immediately sounded the whistle, applied the brakes in emergency, swiped the brakes in emergency, and applied sand to the rails. I did that as soon as I saw him. I did everything I could do to stop the train before hitting him. The train did stop. When I first saw Mr. Todd, he was on the track between the rails going north and facing the train. When I first saw him, I would say that he was about 700 yards away." The fireman testified that he threw the brakes in emergency and stopped as quickly as possible, and that the bell was ringing by automatic bell ringer. Guy Reeves further testified: "I noticed the condition of the rails, I think, after you mentioned

it. I saw the tracks. This bruise on the track was due to the sand on it. It was noticeable. I know that. It began to be noticeable about where he was hit. It continued on down the tracks a good piece. It did not have the appearance of that kind before that up the track."

It is apparently conceded in the briefs of counsel for the defendant in error that the deceased was a trespasser at the time of the homicide, and that the duty of the railroad to protect him did not arise, under the circumstances of the present case, until the engineer saw him on the tracks of the defendant. "Ordinarily the only duty owing by a railway company to a trespasser upon or about its property is not to wantonly or wilfully injure him after his presence has been discovered." *Hammontree* v. *Southern Railway Co.*, 45 *Ga. App.* 728 (165 S. E. 913); *Young* v. *South Georgia Railway Co.*, 34 *Ga. App.* 537 (130 S. E. 542); *Central of Georgia Railway Co.* v. *Stamps*, 48 *Ga. App.* 309 (3) (172 S. E. 806); *Dodson* v. *Southern Railway Co.*, 55 *Ga. App.* 413, 418 (4) (190 S. E. 392); *Ashworth* v. *Southern Ry. Co.*, 116 *Ga.* 635 (43 S. E. 36, 59 L. R. A. 592). "Even where a person on the track is in fact discovered, it is the general rule that a railway company is authorized to act on the presumption that a person apparently of full age and capacity, standing or walking along or near its track, will leave it in time to save himself, unless it should also appear that such trespasser is in an apparently incapacitated or helpless condition, so that he could not reasonably be expected to extricate himself from his peril." *Hammontree* v. *Southern Railway Co.*, *Young* v. *South Georgia Ry. Co.*, *Dodson* v. *Southern Railway Co.*, supra. It is not contended in the present case that the deceased was otherwise than in full possession of his physical and mental powers. "The mere failure of the employees of a railway company to discover the presence of a trespasser at a place where and a time when it was their duty to anticipate the presence of trespassers, and thereafter to take such needful and proper measures for his protection as ordinary care might require, might amount to a lack of ordinary care on the part of the railway company, but would not, in and of itself, amount to wilful and wanton misconduct." *Hammontree* v. *Southern Railway Co.*, *Dodson* v. *Southern Railway Co.*, supra; *Lowe* v. *Payne*, 156 *Ga.* 312 (118 S. E. 924). "'After the presence of a trespasser upon the track of the defendant in front

of its approaching train is discovered, it becomes the duty of the agents in charge of the train to give him some warning of his dangerous position.' Even though such trespasser may not be deficient in any of his faculties, and while the agents in charge of the train have the right to conclude and act on the conclusion that such person will leave the track in time to save himself from injury, in that they are then under no duty to check the speed of the train, yet as a matter of ordinary prudence and care, it is their duty to sound the whistle or ring the bell, as a warning of the approaching danger." *Fox* v. *Pollard,* 52 *Ga. App.* 545 (2), 547 (183 S. E. 854). The failure of the servants of the railway company to exercise proper judgment as to when the exact moment of a trespasser's peril begins can not be charged against them as wilfulness and wantonness. *Pressley* v. *Atlanta & West Point R. Co.,* 48 *Ga. App.* 382, 387 (172 S. E. 731) ; *Richardson* v. *Pollard,* 57 *Ga. App.* 777, 780 (196 S. E. 199).

The action instituted by the plaintiff is predicated on the theory that the defendant failed to give any warning to the deceased while on its tracks, and that its conduct amounted to wilfulness and wantonness. The testimony of disinterested witnesses, eight or nine in number, living or being in the immediate vicinity of the accident, was that the whistle was blown for the crossing and that immediately thereafter, just before the train struck the deceased, there were several sharp blasts. According to the testimony of the witnesses for the defendant the bell was rung by means of an automatic bell ringer. If the bell was rung as testified to by such witnesses the conduct of the defendant could not be said to have been wilful and wanton. It is contended by the defendant in error, however, that on the question whether or not the bell was rung an issue was made for the determination of the jury, and that this conflict arises by reason of the testimony of the son of the deceased that "the train came and I didn't hear anything at all until this sharp blowing" just before the deceased was struck. In respect of whether positive testimony, such as that introduced by the defendant as to the ringing of the bell, may be overcome by "negative testimony," the test is always to be made with reference to the facts and circumstances surrounding the witness at the time of the accident, even though the witnesses be of equal credibility. Ordinarily, as was held in *Johnson* v. *State,* 14 *Ga.* 55 (10), posi-

tive testimony must outweigh that which is negative. In *Atlanta & West Point R.* v. *Johnson,* 66 *Ga.* 259, 271, a charge in the following language was upheld: "The preference the law gives positive over negative is when one swears positively that a thing happened and another swears that he was present and did not see it or hear it (as the case may be), it being quite possible that it may have happened although the other may not have seen or heard it." As was held in *Hambright* v. *Western & Atlantic R. Co.,* 112 *Ga.* 36 (37 S. E. 99) ; "The affirmative and positive testimony of witnesses as to the actual facts of a particular occurrence can not be overcome by testimony which is negative in character, or consists of mere opinions." Where, however, one swears that a thing occurred in the presence of another and the other that it did not, the testimony of each is positive and not negative. But the testimony of a witness that he did not hear the bell or whistle of an approaching locomotive, without proof that he listened for a signal or that his attention was in any way directed to it, or that he probably would have heard it if it did sound, can not overcome positive testimony of other credible witnesses that such a signal was given at the time in question. 10 R. C. L. 1011, § 202. For cases showing circumstances under which "negative testimony" was entitled to be considered by the jury as against positive testimony, see *Georgia Railroad & Banking Co.* v. *Wallis,* 29 *Ga. App.* 706 (116 S. E. 883) ; *Climer* v. *Southern Railway Co.,* 43 *Ga. App.* 650 (159 S. E. 782) ; *Pollard* v. *Gorman,* 52 *Ga. App.* 127 (182 S. E. 678) ; *Southern Railway Co.* v. *Riley,* 60 *Ga. App.* 475 (4 S. E. 2d, 54).

The testimony of the witnesses for the plaintiff, except Worcester Todd, must be said to have been given with reference to the manner in which the whistle was blown, and not as to whether or not the bell had been rung. However, the examination of the witness Todd did not disclose, with reference to the ringing of the bell, any fact from which it would be a reasonable inference that he was aware of the approach of the train or giving it any attention until it was almost on his father, at which time the witness heard a sharp blast of the whistle. He was then several hundred yards distant, with a thick growth of trees and underbrush between him and the train, and was "standing on a dam, looking at some fish playing in the water." He did not speak with reference to any

ringing of the bell, merely testifying that "I didn't hear anything at all until this sharp blowing," and there was no evidence which would authorize an inference that he could have heard the bell if he had been aware of the approach of the train and had been listening instead of devoting his attention to the fish. In the absence of such a showing, the mere statement that, under the circumstances disclosed, he heard nothing, would not be sufficient to raise an issue for the jury on the question of whether or not the bell was rung. The evidence must therefore be taken as showing by unimpeached witnesses that the engineer made an effort to warn the trespasser by the ringing of the bell, and, however insufficient and negligent his conduct might have been, it negatives any wilfulness or wantonness on the part of the engineer or such acts as would illustrate an utter disregard for the welfare of the deceased. "It will not do to say that the jury are the judges of whether such conduct exists. They are not the judges of it, when there is no evidence of it. Issues of fact are to be left to the jury, where the pleadings and evidence justify it; but not where there is no evidence authorizing it. There must be something more than the mere proof of failure to give a statutory signal or make a stop required by a statute in approaching a crossing. There must be affirmative evidence of facts tending to show wilfulness, wantonness, or the existence of particular circumstances from which an inference of a conscious indifference to consequences might legitimately be drawn. And these facts must be shown in addition to the mere omission to give statutory signals or take statutory precautions in approaching crossings. If this be not the law, then practically every case of negligent injury can be made the vehicle of submitting to the jury the question of wilfulness and wantonness, by merely using adjectives in describing the character of the negligence." *Southern Railway Co.* v. *Davis,* 132 *Ga.* 812, 818 (65 S. E. 131). This ruling, while dealing with the question of violating a statutory provision, is equally applicable in principle to the facts of the present case. Under the authorities above cited and the evidence introduced, the jury was not authorized to return a verdict for the plaintiff, inasmuch as the conduct of the defendant could not reasonably be said to have been wilful and wanton. The court erred in overruling the defendant's motion for new trial.

*Judgment reversed. Sutton, J., concurs.*

STEPHENS, P. J., dissenting. While, as stated in the Georgia decisions, the company owed no duty to the plaintiff's husband as a trespasser on its track until his presence became known to the servants of the defendant operating the train, and when his presence became known the only duty owed by them to him was not to wantonly and wilfully injure him, yet it has been held that the conduct of the operators of a railroad train, after a trespasser's presence on the tracks is known to them, amounting to negligence, may amount to wilfulness and wantonness. "The only duty which a railroad company owes a trespasser is not to injure him wantonly or wilfully; and ordinarily this rule imposes upon the company simply the duty of taking proper precautions after the presence of a trespasser in a position of peril has been discovered." *Ashworth* v. *Southern Ry. Co.,* 116 *Ga.* 635, 637 (43 S. E. 36, 59 L. R. A. 592) ; *Crawford* v. *Southern Ry. Co.,* 106 *Ga.* 870, 873 (33 S. E. 826) ; *Bullard* v. *Southern Ry. Co.,* 116 *Ga.* 644, 647 (43 S. E. 39) ; *Southern Ry. Co.* v. *Chatman,* 124 *Ga.* 1026 (53 S. E. 692, 6 L. R. A. (N. S.) 283, 4 Ann. Cas. 675) ; *Atlantic Coast Line R. Co.* v. *O'Neal,* 180. *Ga.* 153 (178 S. E. 451). As I understand the law, it would be a question of fact for the jury whether such negligence on the part of the operators of the railroad train, under all the circumstances, amounted to wilful and wanton conduct. Construing both lines of decisions together, the true rule under the Georgia law is that after the operator of a train discovers the presence of a trespasser on the track the operator's duty is to use the due care and diligence necessary under the circumstances not to injure him. Under a proper construction of the decisions I am of the opinion that the engineer or operator of a train, after discovering the presence on the track of a trespasser, owes to him the same duty that he would owe to any other person on the track, irrespectively of whether the latter is a trespasser or not. See American Law Institute Restatement Law of Torts, § 336. Under any view, it is a jury question whether the conduct of the operator of the train under the circumstances was wilful and wanton, or was not the care and diligence due to the trespasser when seen upon the track.

As I understand the law, the mere fact that the engineer, after discovering the presence of the trespasser on the track, may have acted in some manner, such as ringing the bell, or blowing the

whistle, would not as a matter of law relieve him of the charge of wilful and wanton conduct. I do not concur in the proposition, that, although it may appear conclusively in the case at bar that the bell was rung by the operator of the train when the plaintiff's husband was first observed on the track, the operator of the train was not guilty of wilful and wanton conduct as respects the person on the track. Therefore it is not necessary, to constitute wilful and wanton conduct on the part of the operator of the engine, that both the bell and the whistle were not sounded. When the operators of a railroad-train become aware of the perilous situation of a person on the track, they should give a timely warning by bell, whistle, or otherwise, where it is apparent that the person is oblivious of the danger and is not preparing to leave the track. This might, under the circumstances, include both the ringing of the bell and the sounding of the whistle. 52 C. J. 598; Malko v. Chicago &c. R. Co., 99 Neb. 158 (155 N. W. 876).

In *Humphries* v. *Southern Ry. Co.*, 51 *Ga. App.* 585, 589 (181 S. E. 135), it was ruled: "After the presence of a trespasser upon the track of the defendant in front of its approaching train is discovered, it becomes the duty of the agents in charge of the train to give him some warning of his dangerous position. Even though such trespasser may not be deficient in any of his faculties of sight or hearing, or there be no surrounding physical conditions to interfere with or hinder the exercise of such faculties, and while the agents in charge of the train have the right to conclude and act on the conclusion that such person will leave the track in time to save himself from injury, in that they are then under no duty to check the speed of the train, yet 'as a matter of ordinary prudence and care, it is their duty to sound the whistle and ring the bell, as a warning of approaching danger.' . . And the jury would be authorized to find that such negligence, under the circumstances, amounted to wantonness." In *Hammontree* v. *Southern Ry. Co.*, 45 *Ga. App.* 728 (165 S. E. 913), citing authorities, it was held that "A failure to exercise ordinary care to prevent injury to a trespasser after his presence has become actually known may amount to wantonness." After quoting from, citing, and following *Humphries* v. *Southern Ry. Co.*, supra, this court in *Fox* v. *Pollard*, 52 *Ga. App.* 545, 548 (183 S. E. 854), held: "So where it appears . . that the plaintiff was walking along the tracks

of the defendant, that the engineer in charge of its approaching train actually saw him on the tracks, walking with his head down towards the engine and train, in time to have rung the bell or blown the whistle and thereby attracted plaintiff's attention to the approaching danger, and where it is charged that such conduct on the part of the engineer was wilful and wanton, and that by reason thereof the plaintiff was injured, . . it was a question for the jury whether plaintiff made a case entitling him to recover of the defendant for his injuries."

It is contended by counsel for the defendant that the company owed to the plaintiff's husband the duty only of either ringing the bell or blowing the whistle upon its servants in charge of the operation of the train observing him walking along the track toward the approaching train; that it did not owe the duty of both ringing the bell and blowing the whistle; that the evidence shows conclusively that the bell was ringing from the time the train approached the crossing until it struck the husband of the plaintiff; and that a verdict in favor of the plaintiff, based on the theory that the defendant's agents were guilty of wilfulness and wantonness, was unauthorized and contrary to law. Counsel further contend that this is the rule laid down in *Fox* v. *Pollard,* supra. I can not agree to this contention. In the first place, the evidence does not show conclusively that the bell of the engine was ringing continuously until the train struck the plaintiff's husband. It appears from the testimony of the engineer and the fireman that the bell was rung as the train approached the public crossing, and that the bell was rung at the time the train struck plaintiff's husband. It does not affirmatively appear that the bell was ringing from the time the operators of the train saw plaintiff's husband in a position of peril until the train ran over him. There is testimony of the plaintiff's son that the operators did not give any warning or signal of any kind until just at the time the locomotive struck his father. In the second place, under all the circumstances, the ringing of the bell alone, upon the observance by the engineer of a person in a position of peril on the tracks in front of a rapidly approaching locomotive, might not meet the requirements of the duty owed to such person, and even though the bell might have been rung, ordinary and common prudence might require that the whistle be blown in order for the person on the track to have ample and sufficient

warning of the approaching train. In other words, under certain facts and circumstances, the jury might find that the duty required of the servants in charge of the train included not only the ringing of the bell but also the sounding of the whistle in time for the person on the track to get out of the way of the train. Again, the decision in *Fox* v. *Pollard,* supra, does not hold that the ringing of the bell or the sounding of the whistle, either one, would in all cases be sufficient to meet the requirements of the duty placed on the operators of a train on observing one on the track in front of the train. That case was based mainly on *Humphries* v. *Southern Ry. Co.,* supra, which was based on the principle laid down in 2 Rorer on Railroads, 1122, that "as a matter of ordinary prudence and care, it is their duty to sound the whistle and ring the bell, as a warning of the approaching danger," which principle was quoted with approval in *Central Railroad & Bkg. Co.* v. *Denson,* 84 *Ga.* 774 (11 S. E. 1039). As stated in *Southern Ry. Co.* v. *Wiley,* 9 *Ga. App.* 249, 252 (71 S. E. 11), after quoting the above principle, "This apt enunciation of the law has been approved by the Supreme Court in frequent decisions." In *Fox* v. *Pollard,* supra, the defendant neither rang the bell nor blew the whistle.

Whether or not it is established conclusively as a matter of law that the operators of the train exercised due care and diligence in ringing the bell, it does not appear conclusively and without dispute from the evidence that the whistle was sounded when they first saw the plaintiff's husband on the track, or, after it was sounded, that he had time to leave the track. From the statement of the engineer alone made to Worcester Todd, when the dead man was picked up, and which is part of the res gestæ and binding on the defendant, that the engineer, when he came around the curve, saw the plaintiff's husband on the tracks, but thought that he would get off the tracks, and, quoting from the statement attributed to the engineer, that "he didn't get off until I got right on him, and I blew the whistle, slammed on the brakes, and ran right into him," it could be inferred that the whistle was not blown in time for the plaintiff's husband to leave the tracks, and was not blown until the train had gotten "right on him." It appears that from the curve where the engineer said he first saw the deceased to the point where the train hit him is from 275 to 300 yards. Also it appears from the testimony of Worcester Todd, who, it is inferable, was within

hearing distance of the train at the time, that he did not hear anything until the "sharp blowing," and that the "sharp blowing" took place where he picked up the body of the deceased. A jury was authorized to find that the operators of the train failed to give the plaintiff's husband a timely and sufficient warning, either by the ringing of the bell or the blowing of the whistle, after the engineer had observed his presence on the track. Even if the bell had been rung after the plaintiff's husband had been observed on the track by the operators of the train, it could be inferred from the evidence and from the circumstances in evidence that it was not a sufficient warning, because the plaintiff's husband did not hear or heed it. Even assuming, though it does not appear conclusively from the evidence, that the bell was rung, as contended by the defendant, after the plaintiff's husband had been seen by the engineer on the track, the jury could infer that this was not a sufficient warning under the circumstances, and it could nevertheless still be inferred that a timely and sufficient warning by the blowing of the whistle was not given, and that the failure of the operators of the train to give warning by the blowing of the whistle, under the circumstances, after observing the plaintiff's husband on the track, notwithstanding the ringing of the bell, was a wilful and wanton act.

I am of the opinion that the verdict for the plaintiff was authorized, and that the judge did not err in overruling the motion for new trial.