1. The evidence authorized the verdict, and the court therefore did not err in overruling the general grounds of the motion for a new trial.
2. The charges of the court, quoted in division two of the opinion, were not error for the reasons assigned.
(a) It is the duty of the operator of a motor vehicle on a highway to have the vehicle under immediate control not only when he is conscious of the presence of a pedestrian on a highway, but also when he should discover the presence of such pedestrian by the exercise of ordinary care.
(b) The term "immediate control" as used in Code § 68-304 is not too vague, indefinite, and uncertain to be enforced.
(c) The court did not err in not defining the term in the absence of a request.
3, 4, 5. The assignments of error in grounds two, three, four, five, and six of the amended motion for a new trial are without merit.
6. The word "agent" as used in Ga. L. 1947, p. 568, amending Code § 38-1801, means any agent available to the party (principal) as a witness in a pending case, and does not refer merely to an agent who has some relation or connection with the transaction in litigation. The assignment of error in ground seven is without merit for any reason assigned.
7. The court did not err in refusing to permit the defendant Garmon to cross-examine an agent of the defendant Hall, who was put on the stand for the purposes of cross-examination by the plaintiff.
8. It was not error for the court not to apprise the jury of the fact that the defendant Garmon did not have insurance, after the jury had been qualified as to the insurance carrier of the defendant Hall.
 DECIDED MARCH 4, 1949.
Mrs. John W. Cassell instituted this action for damages against Jesse T. Garmon and Charles M. Hall for the homicide of her husband, allegedly caused by the negligent operation of an automobile driven by Garmon and owned by the codefendant Hall. The petition alleged substantially the following: On December 6, 1947, at about 10 p. m., the deceased husband was returning home from his work as a railroad-crossing watchman. While the deceased was walking across Glenwood Avenue in the unmarked *Page 731 
crosswalk at the corner of Cameron Street and Glenwood Avenue, Atlanta, Georgia, going from the northeastern corner to the southeastern corner of said intersection at a place where pedestrians cross Glenwood Avenue, the defendant Garmon, driving a 1947 Lincoln sedan belonging to the defendant Hall, came down Cameron Street, approaching the deceased from the rear, and turned into Glenwood Avenue, striking the deceased with said automobile, inflicting injuries which resulted in his death. Garmon at the time of the injury was driving said car as the agent of Hall and was acting within the scope of his authority. The defendants were negligent in the following particulars, and such negligence was the proximate cause of the death of the deceased: (a) driving said automobile under the influence of intoxicating liquors in violation of a city ordinance of Atlanta and in violation of State law; (b) driving said automobile in excess of 25 miles per hour in violation of a city ordinance of Atlanta; (c) entering said intersection at an excessive rate of speed, charged to be in excess of 25 miles per hour; (d) failing to yield the right of way to the deceased, as required by city ordinance; (e) failing to have said automobile under his immediate control; (f) failing to stop before entering said intersection; (g) failing to stop before turning into Glenwood Avenue; (h) failing to reduce speed before making said turn into Glenwood Avenue; and (i) failing to give warning to the deceased by sounding his horn. The petition specially pleaded the following ordinances of the City of Atlanta, relating to: (1) right of way of pedestrian crossing at an intersection, (2) driving under the influence of intoxicants, and (3) maximum speed limit of 25 miles per hour. The defendant in his answer denied all material allegations of the petition, and further answered alleging that the deceased's death resulted from his failure to exercise ordinary care for his own safety, and that the deceased's negligence was greater than that charged against the defendant.
There were no eyewitnesses to the collision, and the plaintiff bases her case solely on circumstantial evidence. Substantially the following evidence was adduced on the trial of the case: Richard A. Boone, city detective for the Atlanta Police Department testified: "Cameron Street there runs north and south and *Page 732 
Glenwood east and west. When we got there the injured man was sitting in an upright position aided by Mr. Garmon, propping him up about 11 feet and 2/12 inches from the southeast curb of Glenwood. His body was lying in Glenwood intersection. . . I say, if the sidewalk had shot directly on across the street his body was lying in the sidewalk line, if it was projected across the street, across Glenwood Avenue. . . The skid marks begun over on the side near the curb. In other words, the car, from the time he put on the skid marks, went 37 feet right down by the side of the curb. The skid marks started 25 feet after the bloodspots there on the street. . . It was 37 feet exactly from the point of the start of the skid marks to the end of the skid marks. The car was 62 feet on the south side of Glenwood from the intersection from Cameron Street going east on the southeast side. . . There was no indication of any impact on the front of the automobile; however, on the right side at the back window there were some dirty streaks. . . It looked like a hand had drug down the side of the car. . . It's a broad intersection. Cameron Street is narrower than Glenwood, and it makes the angle across the street there quite long; I mean, the angle is greater than 90 degrees of the two streets. . . Cameron Street does not run into Glenwood at right angles; there is a jut off, a slight jut off there. . . After they put the injured person in the ambulance I got close enough to smell Mr. Garmon's breath; I smelled an alcoholic odor of some sort. At the time he had an impediment in his speech, his eyes didn't look just exactly right, as if they didn't focus. The man was not drunk, he was under the influence of some intoxicant; I would say he was under the influence enough to impair his driving ability but he was definitely not drunk. . . I don't recall finding a liquor bottle there that night; we did not run across one."
Mrs. John Cassell, wife of the deceased, testified that he was 68 years of age, in good health, and earning from $2300 to $2400 annually.
S. D. Burnett testified for the plaintiff as to the location of the injured man: "If the sidewalk had extended across the street, he would have been in the extension of the sidewalk, I think."
R. W. Cagle, witness for the plaintiff, testified as follows: "I *Page 733 
had occasion to go out and measure the intersection of Cameron and Glenwood. The pavement surface of Glenwood at that intersection, from the corner of the curb to the corner of the curb, across, is about 45 feet. Where the curve gets out of the curb and down into the body of the street, it is about 32 feet. At the intersection, from the corner of the curb to the corner of the curb, at Cameron Street, it is approximately the same distance, about 45 feet. The width of that street, after you get in the curve, at the intersection, and you get into the body of the street, is 32 feet. Both of them are the same distance in the body of the streets and both are approximately the same width at the intersection."
H. E. Grizzle testified for the plaintiff: "When I got there the body was laying in the street from the curb. . . The injured man was 8 or 10 feet from the curb on the east corner, the southeast corner of the intersection; he was in Glenwood."
Charles Hall, codefendant, testified: "I believe it was around 7 in the evening when he left the lot with the car. . . Mr. Garmon was not under the influence of intoxicating liquor when he left my place of business."
Harry McCollister Jr., city detective, testified: "We found skid marks 25 feet from the point where the body was found; there were no skid marks but after 25 feet we did find skid marks and they were approximately 37 feet as well as I remember; the car was still sitting in the skid marks. I had occasion to notice Mr. Garmon. Mr. Garmon was under the influence of some intoxicant; he was not drunk but he was under the influence. . . The headlights of the Lincoln automobile were on, the front headlights; I couldn't say whether it was the upper beam or the lower beam. I would say those headlights shone a 100 yards in front of that car; they were good and strong; it was a brand new automobile, good lights. . . The right rear tire was flat when we drove up there. . . The tires had very good tread, and I don't think the automobile had much mileage on it. . . I did not find any whisky bottle; I didn't see one in his car that I recall. . . As to what was it about Mr. Garmon that I used as a basis for my opinion that he was under the influence of some form of intoxicant: Well, he didn't talk exactly normal, *Page 734 
and when he got in the car, he might have been a little off balance — I mean, might have staggered just a little. You ask me not to tell you what might have been but to tell you actually what did occur. Well he did. He was off balance when he got in the car, and he made the statement to us that he had been drinking; I asked him if he had, and he said `Yes,' he had a drink or a few drinks or something to that effect; in other words, he was drinking. As to whether I remember what he did say as to whether he had a drink or a few drinks: I think he said a drink."
W. G. Manders, ambulance driver, testified: "When we arrived there, the man was laying in the street near the curb, the southeast corner. I believe he was in the crosswalk. . . Mr. Garmon was under the influence, I smelled intoxicants on his breath."
Jesse T. Garmon, defendant, testified: "On this particular Saturday night, December 6, 1947, my car came in contact with Mr. Cassell at the intersection of Cameron and Glenwood as I was making a turn, driving 10 miles an hour. . . At the time my car struck Mr. Cassell I was going home. That place at Cameron and Glenwood is on the route that I take to my home. I came into Cameron, and turned to the right. It is a short street, it was not very far; I went to Glenwood Avenue and then turned to the left; it is a deep left turn, going east on Glenwood Avenue towards East Atlanta. . . On the night in question I came down Cameron Street, stopped, and then turned left into Glenwood; I intended to turn left into Glenwood and go home but I stopped before I got into Glenwood; there is not a stop sign there but I stopped any way. . . I left the lot at 9 o'clock and went to my groceryman; I came out Highland Avenue to that grocery store, and it took me about an hour to get my groceries and then I started home. . . I followed a straight line and went on Boulevard came up to Boulevard and turned to the right; then I went south on Boulevard to the first red light and then I turned to the left and went down that street into Cameron; I think that is the second block down that street. When I got to Cameron Street I turned right on Cameron and came into Glenwood. When I got to Glenwood I turned left going home. After the collision I stopped right there. . . I *Page 735 
never did see Mr. Cassell at any time; I just heard a little flop; it is a deep left turn, and all I heard was a flop, like that. I don't know whereabouts on the side of the body of my car that I heard this light noise; it sounded to me like it was on the lefthand side of the body of the car; I thought that I had hit a dog; I got out and saw it was a man. With respect to turning the corner, it was as I was making a deep elbow turn to the left that I heard this noise; just as I completed the turn, I heard this flop and got out. As to whether I made my left turn into the far side of Glenwood Avenue or made a short turn — I just made an ordinary turn like you would. When I came to the intersection, I was on the right-hand side of Cameron Street. As to whether I continued out into the intersection on the right-hand side of Cameron Street before I turned — I was in the edge of Glenwood and turned left. As to whether I continued driving straight ahead on Cameron or continued straight on out into the middle of Glenwood before I turned — I started turning before I got to the middle of Glenwood. I would say I got about two-fifths of the way out in Glenwood Avenue before I started turning. I was on my side of the road, the right-hand side of Glenwood. As to whether I was on the right-hand side of Glenwood when Mr. Cassell came in contract with my car — I had already turned into Glenwood and straightened out when I heard the lick. I think I had just straightened up going down Glenwood; I will say I had just about completed my turn, I was about at the end of the curve. . . I had had one drink that night; I took it at a filling station on Fort Street. I took it before I entered the grocery store. This filling station is on Fort Street. . . I bought a pint of liquor at the Fort Street liquor store. I drove to this place, and went in the liquor store and got this whisky and I just took one drink. . . I continued on after I took the drink of whisky. Then I went on up to the grocery store and I got out and went in the grocery store. There was no other place I stopped that night besides there and the grocery store."
The jury returned a verdict in favor of the plaintiff against Garmon and Hall jointly and severally in the amount of $8000. The defendant Garmon moved for a new trial on both general and special grounds, and to the judgment overruling such motion he excepted. *Page 736 
1. The defendant contends that only one act of negligence was proved as alleged, to wit, that the defendant was driving while under the influence of intoxicating liquor, and that that negligence was not shown to have been the proximate cause of the death. We can not agree with this contention. The jury could have found, not only that the defendant was driving while under the influence of whisky, but that he was negligent in other respects and that such other negligence was caused at least in part by his condition. The defendant testified that he stopped his car at the intersection and proceeded across it at ten miles an hour. Evidence of other witnesses showed that the defendant traveled 25 feet after hitting the deceased before applying his brakes to the point where the tires would skid, and that the four tires of the defendant's car skidded 37 feet beyond the initial 25 feet before the car was brought to a stop. These circumstances could have been found by the jury to be inconsistent with the defendant's testimony that he stopped at the intersection and crossed it at 10 miles an hour. Furthermore, the jury could have found that the defendant had drunk more whisky than he testified he drank. He did not account for the whisky which he said remained in the bottle after he drank from it, if there was any remaining. The finding was also authorized that the defendant's bright lights were on at the time of the incident. A police officer who drove the defendant's car to his home testified that the lights shone a hundred yards in front of the car. There was no evidence that they were changed after the collision. We think that the evidence authorized the jury to find that the defendant was guilty of nearly all of the acts of negligence alleged and that they were the proximate cause of the death, and that the plaintiff's action was not defeated as a matter of law because a finding was demanded that the deceased's death was due to his failure to exercise ordinary care. We do not feel that a more detailed discussion of the facts and permissible inferences is necessary, as the material facts are set forth above.
2. The court charged the jury as follows: "I charge you that *Page 737 
the law requires that, upon approaching or passing any person in the roadway, or traveling any public street or highway, the operator of a motor vehicle shall at all times have the same under immediate control. I charge you that, if defendant Garmon was driving an automobile upon a public street or highway and was approaching or passing petitioner's husband in the roadway, and that at such time and place defendant Garmon failed to have said motor vehicle under immediate control, such failure would constitute a violation of law and would be negligence."
"I charge you that, if defendant Garmon was driving an automobile upon a public street or highway and was approaching or passing petitioner's husband in the roadway, and that at such time and place defendant Garmon failed to have said motor vehicle under immediate control, such failure would constitute a violation of law and would be negligence."
(a) One exception to these charges is that Code § 68-304 was intended to apply only to those instances where the operator of an automobile was consciously and with the knowledge of the presence of a pedestrian passing a pedestrian walking in the roadway, and that it would not be applicable where the presence of the pedestrian was not known to the operator of the automobile. This exception is without merit. The Code section applies to situations where the operator of an automobile could ascertain the presence of the pedestrian by the exercise of ordinary care. To hold otherwise would relieve the operator of an automobile from the duty to anticipate the presence of pedestrians and to exercise ordinary care in discovering and protecting them. O'Dowd v. Newnham, 13 Ga. App. 220
(80 S.E. 36); Eubanks v. Mullis, 51 Ga. App. 728 (181 S.E. 604);Claxton v. Hooks, 68 Ga. App. 383 (23 S.E.2d 101);Jackson v. Crimer, 69 Ga. App. 18 (24 S.E.2d 603).
(b) Another exception is that the phrase, "under immediate control," is too vague, indefinite, and uncertain to be enforced. This court has defined the term. Central of Georgia Ry. Co. v.Burton, 33 Ga. App. 199 (125 S.E. 868). "The term used by the statute can not imply the constant ability to bring the car to a full stop instanter. It must mean, as the judge in effect charged, that, in approaching such a crossing, the operator of an *Page 738 
automobile shall have and keep the machine under such constant control as would enable him instantly to govern its movements, including the power to stop within a distance in which such a vehicle, in good mechanical condition, driven by a reasonably skilful driver and traveling at a lawful rate of speed, could be stopped." The court there did not define legal rate of speed, but it obviously did not mean just any speed under the maximum legal limits, but meant the speed which was proper under existing surrounding circumstances. In the last analysis, immediate control means reasonable control. There is a good statement of the duty of an operator of a motor vehicle in 42 Corpus Juris, "Motor Vehicles," p. 920. "It is the duty of the operator of an automobile to keep his car under reasonable control, so that he may avoid collisions with, and injury to, other users of the highway who are themselves exercising reasonable care." Where a statute provides a general rule of conduct, amounting to a requirement to exercise ordinary care, it is not error to charge that the failure to do so will constitute negligence per se, because it is really superfluous to mention negligence per se when proof of failure to exercise ordinary care as a matter of fact is all that is required. As to such a charge, see Hollomon
v. Hopson, 45 Ga. App. 762 (166 S.E. 45).
(c) As the charge was essentially in the wording of the statute, it was not error not to explain the meaning of "immediate control," in the absence of a timely request therefor.
3. The court charged the jury as follows: "I charge you that the law provides that no person shall operate a motor vehicle upon any public street or highway while under the influence of intoxicating liquors. If defendant Garmon operated an automobile upon a public street or highway at the time and place alleged, and if you find that while doing so he was under the influence of intoxicating liquors, such act would constitute a violation of law and would be negligence." The exception to this charge is that it should have been qualified by the further charge that the driving while under the influence of intoxicating liquors must have in some way contributed to the injuries before the defendant could be found liable for such act. Assuming that this assignment of error is sufficient, the charge was correct as far *Page 739 
as it went and was amplified by the charge shown in the next division of this opinion.
4. The court further charged: "If you should believe that the defendant, Jesse T. Garmon, was operating the automobile under the influence of intoxicating liquor at the time John W. Cassell was injured, as alleged in the petition, but if you believe that Garmon's act of so operating said automobile was not the proximate cause of the injury to Mr. Cassell, but that said injury would have occurred regardless of Garmon's said alleged act, then no recovery can be given to the plaintiff based merely upon Garmon's alleged act of operating the automobile under the influence of intoxicating liquor." The exception to this charge is that the words, "but that said injury would have occurred regardless of Mr. Garmon's alleged act," were confusing to the jury in that these words were insufficient to inform the jury that the court had reference to the influence of intoxicating liquors and not to any other act of Garmon's at the time. We do not think that the jury was confused by this charge. The judge was charging at the time about only one act, that of driving while under the influence of intoxicating liquors, and it does not seem reasonable to think that the jury would construe the words above quoted as referring to other acts about which the judge was not speaking at the time.
5. It was not error to fail to charge the jury that the plaintiff could not recover if the deceased could have avoided the negligence of the defendant by the exercise of ordinary care, in the absence of evidence that the deceased could have discovered the negligence of the defendant and could have avoided it by the exercise of ordinary care. Grounds 4, 5, and 6 of the amended motion are without merit.
6. Ground 7 of the amended motion assigns error on the court's permitting the plaintiff's attorney to call to the witness stand a bookkeeper of the defendant C. M. Hall. One complaint is that the word "agent" as contained in the amendment to Code, § 38-1801 (Ga. L. 1947, p. 568) refers only to an agent who was an agent of the party with relation to or who had some connection with the transaction under investigation. We find no support for such a contention. The act itself makes no limitation. *Page 740 
In this case the witness was evidently in the courtroom and available to the defendant Hall as a witness. Whether the party could subpoena an opposite party's agent and put him on the stand for purposes of cross-examination, is not before us for decision. Furthermore, the testimony elicited from the witness had relation to a matter in litigation and was not harmful to the defendant Garmon. His testimony identified checks and books showing various payments from the defendant Hall to the defendant Garmon, showing payments of $49.50 nearly every week from April 4, 1947 to December 26, 1947, also the following other payments. December, 1946, $250; February 28, 1947, $198; March 31, 1947, $247.50; May 2, 1947, $640; December 31, 1947, $33.03; January 1, 1948, $198. The contention is that the testimony was prejudicial to Garmon because it showed substantial payments to Garmon, which might have caused the jurors to believe that he was a man of sufficient financial means to cause them to return a greater verdict against him than they otherwise might have done. This ground is without merit.
7. Ground 8 of the amended motion complains of the refusal of the court to permit counsel for Garmon to cross-examine the bookkeeper of Hall, who was put up for cross-examination by the plaintiff. As held in division 6, it was not error to refuse the privilege of cross-examination as a matter of right on the theory that the witness was the plaintiff's. Under the facts of this case, neither was it such an error for the judge to refuse the permission in the exercise of his discretion as will require the grant of a new trial, especially when the witness gave no testimony on the question of the liability of the defendant Garmon. Davis v. Wright, 194 Ga. 1 (21 S.E.2d 88).
8. Ground 9 of the amended motion complains of the failure of the court, upon the mere oral request of counsel for the defendant Garmon, to notify the jury that the defendant Garmon had no insurance, in view of the fact that the jury had been qualified as to whether they were employees in, or stockholders of the insurance company which carried the defendant Hall's insurance, and whether they were related to the stockholders thereof. This ground is without merit. In such a case as this, the question of insurance is utterly immaterial insofar as the merits of *Page 741 
the case are concerned. The jury did not know the provisions of the policy, whether it protected Hall to the extent of $100 or $10,000, and there is no reason to believe that the jury would have rendered a verdict against Hall beyond the limit of his insurance policy, and would not have rendered a verdict against Garmon beyond the limit of Hall's insurance policy, if it had known that Garmon was not covered by insurance. If the jury would have done such a thing, they necessarily would have had to render a smaller verdict against Hall, as the amount as to each had to be the same. If, as some courts have held, the mention of insurance is injurious to the defendant having it, and incidentally to joint defendants who do not have it, the question can be legally injected into the case by the qualification of the jury and so far no way has been devised to prevent it. For a court to instruct a jury that one defendant is not insured, would amount, at least, to an intimation that it would be proper for them to consider that fact as a legal reason why a smaller verdict might be rendered against both defendants simply because one of the defendants had no insurance. The sooner juries are informed what the nature of the insurance coverage is, and that it is dangerous for them to regulate the size of their verdicts by the fact of insurance when they do not know the amount of the coverage, through an erroneous idea that the insurance company is obligated to pay the damages irrespective of the defendant insured's negligence, the sooner this troublesome question will approach a solution. We do not think it idle to believe that a jury which is apprised of the true situation, will refuse to gamble with the rights of a litigant or unwittingly reward a plaintiff with unmerited damages regardless of the rights of a defendant or insurance company.
The court did not err in overruling the motion for a new trial.
Judgment affirmed. Sutton, C. J., and Parker, J., concur.