35142. SOUTHLAND BUTANE GAS CO. *v.* BLACKWELL.

DECIDED OCTOBER 14, 1954—REHEARING DENIED DECEMBER 8, 1954.

278

*J. G. Roberts, John A. Dunaway,* for plaintiff in error.
*Gordon M. Combs,* contra.

NICHOLS, J. 1. The defendant demurred to the allegations, in paragraph 16 of count two, that the driver of the defendant's truck "failed to anticipate the presence of Loyal Blackwell on said road and failed to give any warning of his approach to the said Loyal Blackwell," and that the driver had not "used ordinary care to anticipate the presence of the deceased on said road," and to the charges of negligence in failing to anticipate the presence of Loyal Blackwell on the road, in failing to give notice or warning of the approach of the truck to Loyal Blackwell, and in failing to use ordinary care to steer the truck away from the plaintiff's son to avoid striking him. The grounds of the demurrer were: (1) these allegations were conclusions of the pleader without facts constituting actionable grounds of negligence; (2) the petition does not show why the defendant was

under a duty to anticipate Blackwell's presence or to give him warning, when the defendant had no knowledge of his presence, since it was alleged that Blackwell was lying in a prone position in the road without other facts putting the defendant on notice of his position; and (3) the allegation that the defendant failed to steer the truck away from Blackwell fails to state how and wherein the defendant failed to use ordinary care. The defendant also demurred to corresponding allegations in the third count, upon the same grounds. The facts alleged are that the defendant's driver did not keep a proper lookout and anticipate the presence of the plaintiff's son on the highway, nor warn him of the truck's approach, nor steer the truck away from him. Under the allegations of the second and third counts, the plaintiff's son was already on the highway, in a sitting or prone position, and his presence was sufficient to put the defendant's driver on notice. "The driver of an automobile is bound to use reasonable care and to anticipate that persons along a public street or highway and other persons having equal rights with him may be there. The driver has no right to assume that the road ahead of him is clear, but he must keep a vigilant lookout ahead for pedestrians in traffic." *Claxton* v. *Hooks,* 68 *Ga. App.* 383, 385 (23 S. E. 2d 101); *O'Dowd* v. *Newnham,* 13 *Ga. App.* 220 (1, 2) (80 S. E. 36); *He-Po Gas, Inc.* v. *Roath,* 87 *Ga. App.* 827, 832 (75 S. E. 2d 451). It was alleged that the plaintiff's son was just over the crest of a hill, and Code § 68-303 (j) requires the operator of a motor vehicle to sound his horn "when approaching points on the highways where the view ahead is not clear." Whether in the exercise of ordinary care the defendant's driver should have done what he was alleged not to have done, was a question to be passed upon by the jury. The court did not err in overruling these demurrers.

The court also overruled a demurrer to the amendment of August 10, 1953, in which the plaintiff set up a charge of negligence on the part of the defendant in driving its truck at a greater speed than was reasonable and safe, and without having due regard to the conditions then existing, including the width, grade, character, and common use of the highway, and so as to endanger the life of the plaintiff's son, (adding by amendment of August 11, 1953) in driving said truck at a greater rate of

speed than 35 miles per hour. These allegations were contended to have been conclusions reached by the pleader without stating how or wherein or when the defendant was charged with driving the truck at a greater speed than was reasonable and safe, and without stating the speed claimed to have been greater than was reasonable and safe. The speed alleged was 35 miles per hour, at the time and place of the plaintiff's son's injury, and the width, grade, and character of the highway were alleged. The demurrer was without merit and was properly overruled.

2. In support of the general grounds of the motion, and in connection with several of the special grounds, the movant contends that the plaintiff could not recover as a matter of law in this case, under the pleadings and the undisputed evidence, for the reason that a person, while grossly negligent himself, has no right to expect diligence from others, but is bound to anticipate that others may fail in diligence as he has done and must guard against negligence which he might not discover until too late. See *Central R. & Bkg. Co.* v. *Smith,* 78 *Ga.* 694 (4) (3 S. E. 397), in which the foregoing rule was applied in the case of a trespasser upon the railroad's tracks. Further contentions are advanced, the substance of which is that Blackwell's negligence was the proximate cause of his death.

The evidence showed that the defendant's truck driver, in proceeding along Roberts Road generally from east to west, headed first north and then west as he rounded a curve and went up a hill, and then drove along a fairly level, straight stretch of the highway for 100 feet to B. F. Eller's mail box. From this mail box, looking back along the curve, the road was visible for 400 feet. Although the road was nearly level at the top of the hill, there was evidence that it reached a crest some 10 or 15 feet east of Eller's mail box. The crest was hardly discernible on the photographs of the scene introduced by the defendant. The paved road was about 18 feet wide, with shoulders extending three or four feet beyond the pavement. A driveway to Eller's house came into the road east of his mail box. This was the scene of Blackwell's fatal injuries.

Concerning the conduct of the plaintiff's son, the evidence showed that he got off work at about 5 or 5:30 on March 27, 1953. He arrived at his father's at sundown, with his brother

Glenn, age 27, and his nephew, James F. Bettis, age 17. They ate supper, having previously consumed a pint of whisky. Glenn and Bettis left the house at 6:30 or 7. The plaintiff asked his son several times not to leave, as his son had whisky on his breath, but he went out and met Bettis and Glenn at another house. Glenn left, and Bettis went with the plaintiff's son, on foot, towards Emerson Blackwell's house. They stopped on the porch at Tom Sargeant's house and asked for a ride, but went on when they found that Sargeant's son was not there. Blackwell did not appear to be drunk then, about 35 or 40 minutes before he was struck. Bettis and Blackwell came up Roberts Road to within 75 or 100 feet of the Eller house; Bettis asked Blackwell to go back home, but Blackwell would not go with him and continued to walk along the right side of the road. Bettis walked the half-mile back to the plaintiff's house, taking from 15 to 30 minutes, and when he arrived the plaintiff had already heard of his son's death.

Glover Eller had come to his father's house at about dark and had been there for about half an hour with B. F. Eller's son-in-law, Leonard Dunn. They saw Blackwell near the mail box, 150 feet from the house. He was drunk, and was cursing and hollering for 15 or 20 minutes before the truck ran over him. Two or three cars had passed, and, in the light of their head-lamps, Blackwell could be seen from the house. When they heard a truck coming, they looked out of the house, but did not see Blackwell in the same place near the driveway. They heard a thud as the defendant's truck came by. Blackwell's fingers and bare feet made prints in the dirt of the driveway and showed where he had scrambled about. One of his shoes was in the driveway, and the other was across the road.

Previously, Eller and Dunn had seen a passing motorist stop and come back to talk to Blackwell. This was J. P. Smith, Jr., who testified that he had left his father's house to go to his home at Acworth at 8 o'clock. It was just before dark; the sun was down, and he had just pulled on the lights of his car. He saw Blackwell in the road in front of Eller's drive, with his body doubled up, his feet toward the house and drawn up beneath him, and his head across the road, resting on his arm. Smith swerved to the left, missed Blackwell, went about 100

yards beyond him, turned around, and came back to him. Smith stopped on the opposite side of the road and got out of his car. Blackwell was then sitting upright. Smith said: "Look here, fellow, what in the world are you doing in the road here? You are liable to get killed. You have to get out of this road. Let me take you home." Blackwell said, "You son of a bitch, I'll get you out of the road." Smith saw people on Eller's porch, and, thinking it was a family affair, he left. He concluded, from Blackwell's position on the road and his profanity in reply to an offer of help, that he must have been under the influence of some drug, or whisky, or something.

Louis Hill, the defendant's truck driver, testified that he was familiar with the road and knew it pretty well. "I had just gone up that grade and had just completed the curve when I hit this man. I was not expecting to see him there; I was expecting to see nothing there except the road. I did not anticipate that there would be a man on the road. The lights on my car [truck] were very good that night; they seemed to be all right. I had them on high beam; I had them on bright. . . On the level I could see a hundred feet in front of me with those bright lights. . . My brakes were all right. I stopped in about 100 feet. . . When I saw this man he was laying down in the road. His head was towards the north side of the road. There was not ample room for me to have gone by him there without hitting him. As to whether I mean there wasn't any room on the other side of the road, the other side was clear enough, but when I first glimpsed the man he wasn't over ten or twelve feet from me. There was a dog; somebody had run over it, but the next dog, it was a man, but it was too late then. I mean to say I didn't see this man until I was in 12 to 14 feet of him. I was not asleep. You see, it kind of pitches down there. It is not exactly level, and the lights were over him, and when the lights first hit him I figured it was a dog or something. . . As to what I did when I hit this man, well, after I thought it was a dog, and the next thought was, 'That's a man,' and I tried to miss him. I tried to cut it to the right. I knew I couldn't cut to the left and miss him. I thought I might have straddled him. If I had went straight on, my front wheel and back wheel would have got his head, and his head would have been mashed flat.

The wheel didn't even hit his head. I snatched it like that; just gave it a yank. As to whether or not I tried to stop my truck, I was too close on him, and I just tried to miss him. . . As to whether or not, when I came over the crest of that hill, I didn't slow down or anything, what did I want to slow down for? . . After I got to the top of the hill there just beyond the mail box and before I saw the mail box, after I came over the hill there, I didn't slow down any. Coming up the hill there the truck had slowed down some. . . There isn't but one curve from the cross-roads up to a point there near Mr. Eller's house, one long curve. I slowed up down there as I approached that. At the speed I was traveling I had control of the truck."

The uncontroverted evidence shows that the deceased, having previously consumed some whisky, was lying prone in the roadway, with his head toward the edge, at dusk, with one of his shoes on each side of the highway, under circumstances strongly supporting a finding that he was drunk. "In viewing the conduct of a drunk man for the purpose of determining his negligence or contributory negligence, the state of mind produced by intoxication will be disregarded, and he will be judged as if the conduct were committed by him while in possession of his normal mental capacity. His physical state, though caused by drunkenness, is, however, a condition that enters in as one of the circumstances in judging the negligence of the respective parties to the transaction. In determining the negligence of a defendant as to injuries received by a drunk man, both the mental and the physical condition of the latter, so far as it was known or reasonably ought to have been known to the former, are legitimate matters for consideration." *Rollestone* v. *Cassirer & Co.*, 3 *Ga. App.* 161 (4) (59 S. E. 442). Also see *Powell* v. *Berry*, 145 *Ga.* 696, 699 (1) (89 S. E. 753, L. R. A. 1917A, 306). Determining the negligence of a drunk or sober person is ordinarily for the jury.

While the plaintiff's son may have been negligent in being drunk on the highway, the jury was nevertheless authorized by the evidence to find that this negligence was not the proximate cause of Blackwell's death. There is only an inference, which the jury was not required to draw, that his intoxication caused him to lie in the road; the deceased may have stumbled and fallen, or may have been searching for his shoes. "The duty

imposed by law upon all persons to exercise ordinary care to avoid the consequences of another's negligence does not arise until the negligence of such other is existing, and is either apparent, or the circumstances are such that an ordinarily prudent person would have reason to apprehend its existence. Failure to exercise ordinary care on the part of the person injured, before the negligence complained of is apparent, or should have been reasonably apprehended, will not preclude a recovery, but will authorize the jury to diminish the damages in proportion to the fault attributable to the person injured." *Western & Atlantic R. Co.* v. *Ferguson,* 113 *Ga.* 708 (1, 2) (39 S. E. 306, 54 L. R. A. 802) ; *Augusta-Aiken Ry. &c. Corp.* v. *Jones,* 15 *Ga. App.* 93 (82 S. E. 665) ; *Atkinson* v. *Boggs,* 16 *Ga. App.* 738 (3) (86 S. E. 62) ; *Bach* v. *Bragg Bros. & Blackwell, Inc.,* 53 *Ga. App.* 574 (186 S. E. 711). At the time of the plaintiff's son's negligence in going on the highway, the defendant's negligence as alleged was not in existence.

A corollary of this rule is that, where the injured person's original negligence in placing himself in danger and his obliviousness thereto are discovered by the defendant who thereafter fails to exercise ordinary care to avoid injuring such person, or where the injured person is first negligent in getting into a position of danger from which he is physically unable to extricate himself by the exercise of ordinary care, and the defendant is negligent in failing to discover the injured person's dangerous situation while it is still possible for the defendant to avert the injury by the exercise of ordinary care, the original negligence of the injured person does not operate to bar recovery for the injuries caused by the defendant's negligence. See *L. & N. R. Co.* v. *Plunkett,* 6 *Ga. App.* 684 (65 S. E. 695) ; *Newton* v. *Seaboard Air-Line Ry.,* 17 *Ga. App.* 624 (87 S. E. 908) ; *Georgia R. & Bkg. Co.* v. *Dawson,* 37 *Ga. App.* 542 (141 S. E. 57) ; *Bennett Drug Stores, Inc.* v. *Mosely,* 67 *Ga. App.* 347 (20 S. E. 2d 208) ; *Lovett* v. *Sandersville R. Co.,* 72 *Ga. App.* 692 (34 S. E. 2d 664) ; *Casteel* v. *Anderson,* 89 *Ga. App.* 68, 71 (2) (78 S. E. 2d 831). Compare *Redding* v. *Callaway,* 74 *Ga. App.* 855 (41 S. E. 2d 804). Also see Annotations, 92 A. L. R. 47, 119 A. L. R. 1041, and 171 A. L. R. 365.

As stated in *Bennett Drug Stores* v. *Mosely,* supra, p. 349,

"The exception to the rule we have mentioned [that one must exercise the degree of ordinary care which would be exercised by a sober person to avoid the consequence of another's negligence] is based on the doctrine of last clear chance, or humanitarian doctrine, and is predicated on the theory that there is a duty owed to one who has been so negligent as to render himself incapable of exercising ordinary care to protect himself, after such incapacity is known. This doctrine has been applied in numerous cases where a drunk or disabled person was in a place of danger and where his helplessness or facts indicating helplessness were known to another. Where this situation exists it is such other person's duty to exercise ordinary care to avoid injuring the unfortunate person even though if it had not been for the previous negligence, such as voluntary drunkenness, he could have put himself in a place of safety by the exercise of ordinary care."

Applying these principles to the present case, the jury was authorized to find that the deceased was lying drunk in the road without physical capacity to move himself out of the way in time to avoid being struck by the defendant's truck, after it could have been seen by him. The jury was also authorized to find that, although the driver of the defendant's truck first identified the prone body of Blackwell as being that of a man at a distance of 12 or 14 feet, he could have seen Blackwell from a distance of 100 feet, with his bright lights on and the road straight for that distance, and that, having been able to see something on the road, whether a dead dog or a living human body, he should have slowed, stopped, or turned, in the exercise of ordinary care, to avoid hitting whatever it was, when there was opportunity to do so. Compare *Central of Ga. Ry. Co.* v. *Pelfry*, 11 *Ga. App.* 119 (74 S. E. 854), and *Brewer* v. *James*, 76 *Ga. App.* 447 (46 S. E. 2d 267), dealing with a railroad's duty where an object is seen on the tracks.

It is generally the duty of the driver of an automobile to anticipate the presence of other travelers on the highway, and to have due regard for their rights to the use thereof. *Eubanks* v. *Mullis*, 51 *Ga. App.* 728 (181 S. E. 604). Also see *O'Dowd* v. *Newnham*, supra; *Sapp* v. *Shumate*, 81 *Ga. App.* 432 (59 S. E. 2d 8); *Garmon* v. *Cassell*, 78 *Ga. App.* 730 (52 S. E. 2d 631);

*Flowers* v. *Faughnan,* 31 *Ga. App.* 364 (1) (120 S. E. 670);
*Claxton* v. *Hooks,* supra. The jury was authorized to find that
the defendant, through its truck driver, failed to keep a lookout
and to anticipate the presence of the plaintiff's son on the high-
way, failed to have the truck under immediate control so as to
avoid hitting the plaintiff's son, and failed to reduce speed and
give warning where the road ahead was not clear; and that the
defendant's negligence in these respects was a contributing,
proximate cause of the death of Loyal Blackwell.

The cases relied upon by the defendant in support of its con-
tentions are mostly cases involving trespassers upon a railroad's
tracks, and the rules for determining liability are different from
those applicable where injuries occur on a public highway. In
the case of *Taylor* v. *Morgan,* 54 *Ga. App.* 426 (2) (188 S. E.
44), the facts were that the person injured was riding on the
left running board of an automobile along a dusty road, and was
struck by an automobile proceeding in the opposite direction.
The doctrine of the last clear chance was not available to relieve
the plaintiff of the consequences of the deceased's negligence,
because the defendant had no opportunity to avoid striking
the deceased, and neither of the colliding vehicles was visible
to the persons in the other on account of the dust in the air.

The jury was not required by the evidence to find that the
plaintiff's son's negligence was the sole proximate cause of his
injuries and death, and the evidence supported the verdict for
the plaintiff.

3. Error is assigned, in grounds 5 and 8 of the amended mo-
tion for a new trial, upon charges of the principle of comparative
negligence. The movant contends that this principle had no
application in the case for the following reasons: being grossly
negligent himself, the deceased had no right to depend upon
others being diligent; having assumed a position of obvious
danger, the deceased failed to exercise ordinary care for his own
safety; and there was no evidence of negligence on the part of
the defendant's driver.

As indicated in division 2 of this opinion, the circumstances
of the deceased's fatal injury did not demand a finding that he
was grossly negligent; and there was evidence that the defend-
ant's driver did not keep a lookout and see Blackwell in the road

100 feet away from him, at which point the driver could have slowed the truck and steered it away from Blackwell, but did not do so. The charge, requiring the jury to reduce the verdict in proportion to the fault attributable to the deceased, was not erroneous for the reasons assigned.

4. In ground 6, the movant complains of the charge of the first part of Code § 68-304, providing that a motorist approaching or passing a person walking in the roadway or traveling. a public highway shall have his vehicle under immediate control at all times, and of Code § 68-306, providing for warning to persons riding or driving horses, and that a motorist shall give warning and reduce speed upon approaching a sharp curve, dugway, descent, or other dangerous place on the highway. It is contended that the charge was inapplicable because there was no evidence that the truck was approaching a person walking or traveling on the highway, or that any horses were involved.

The charge of the inapplicable portion of Code § 68-306 concerning horses was not harmful error. *Eagle & Phenix Mills* v. *Herron,* 119 *Ga.* 389 (3) (46 S. E. 405); *Smith* v. *Payne,* 85 *Ga. App.* 693 (70 S. E. 2d 163). Blackwell did not lose his status as a pedestrian by falling onto the pavement. The evidence showed that he was proceeding on foot from his father's to his brother's house. Although he was scrambling or groveling in the Eller driveway for a time, he had moved away from the driveway by the time the defendant's truck came by and was no longer visible in the same place to the persons in the Eller house. The charge was applicable, for, as held in *Garmon* v. *Cassell,* 78 *Ga. App.* 730, 737 (2a), supra, "The Code section [68-304] applies to situations where the operator of an automobile could ascertain the presence of the pedestrian by the exercise of ordinary care. To hold otherwise would relieve the operator of an automobile from the duty to anticipate the presence of pedestrians and to exercise ordinary care in discovering and protecting them."

5. In ground 7, the movant contends that the court erred in charging: "The driver of an automobile is bound to use reasonable care and to anticipate that persons along a public street or highway and other persons having equal rights with him may be there. The driver has no right to assume that the road ahead of

him is clear, but he must keep a lookout ahead for pedestrians in traffic." It is contended that this charge is inapplicable because the defendant's driver had no duty to anticipate that the deceased would be on the highway, and because the deceased, who was not lawfully using the highway, did not have equal rights on the highway with the defendant's driver.

The evidence showed that the defendant's driver was familiar with the road and could have seen the plaintiff's son at a distance of 100 feet; as stated, the circumstances proved do not positively show that the deceased was unlawfully using the highway; and the jury was authorized to find that the duty of exercising ordinary care required the defendant's driver to anticipate that the deceased would be on the highway. The charge complained of was applicable.

6. It is contended in ground 9 that the court erred in failing to charge without request the following principle of law: "A pedestrian and a person with an automobile have each the right to use the public highway, but the rights of an operator of an automobile upon the highway are not superior to the rights of the pedestrian, and it is the duty of each to exercise his right with due regard to the corresponding rights of the other." It is contended that an issue of the case, raised by the answer and the evidence, was that of the relative rights of the parties to the use of the highway at the time and place the deceased was struck. The relative rights of the parties were sufficiently dealt with by the judge in his general charge concerning their duties to exercise ordinary care under the circumstances, and it was not error to omit to charge the stated principle.

7. It is contended in ground 10 that the court erred in failing, without request, to charge as follows: "Voluntary intoxication on the part of the deceased . . . did not relieve the deceased from exercising ordinary care. If . . . the deceased voluntarily became so intoxicated as to be unable, for that reason, to exercise ordinary care, and did so fail, and by the use thereof he could have avoided the consequences to himself of the negligence of the driver, then you would be authorized to find a verdict in favor of the defendant."

It is contended that intoxication of the deceased was an issue, and also whether the deceased failed to exercise ordinary care

in occupying the highway after dark, as disclosed by the evidence. But the charge of the court amply covered the duty of the deceased to exercise ordinary care, and there was nothing in the charge indicating that the deceased was relieved of this duty by his intoxication. Such a negative qualification of the deceased's duty was not required, in the absence of a request for it.

The defendant alleged in its answer "that the deceased was either drunk or asleep when he stretched his body across said highway, and his action in so placing his body at the point where the contact was had which resulted in his death was the sole cause thereof." It may be seen that the defendant did not contend that the deceased's intoxication was the reason for his inability to exercise ordinary care, and the principle contained in the second sentence of the statement above was not applicable to the issues.

8. As no error appears in the special grounds of the motion for a new trial and the evidence supported the verdict, the court did not err in denying a new trial.

*Judgment affirmed. Felton, C. J., and Quillian, J., concur.*

ON MOTION FOR REHEARING.

The defendant in its motion for rehearing contends that we have misconstrued the evidence and have engaged in speculation in holding that there was evidence authorizing the jury to find that the defendant's driver could have seen the body of the plaintiff's son in the road for a distance of 100 feet from the point where he struck the son, in view of the driver's testimony that he did not see the plaintiff's son until he was from 12 to 14 feet away from him: "You see it kind of pitches down there. It is not exactly level, and the lights were over him, and when the lights first hit him, I figured it was a dog, or something. . . I didn't see anybody lying on the highway before I got to the crest of that little ·hill and started down the other side." A. J. Lovelady testified to measurements he had made: the distance from a bloodspot near Eller's mail box east to the crest of the hill was 22 feet, and the distance from the same spot back to the beginning of the curve was 100 feet.

M. G. Eller and Leonard Dunn, who were in Eller's house 150 feet from the road, testified that they could see the plaintiff's son only when the lights of passing automobiles were shining on

him; that two or three cars passed while the plaintiff's son was in front of the house, besides the car that stopped (Smith's) and the defendant's truck; and that it was 10 or 15 minutes from the time Smith left the plaintiff's son until he was struck.

J. P. Smith, Jr., who was proceeding west, as was the defendant's truck, testified: "The sun was down but it wasn't dark to see, you know; it was dark and light, and as you approached there, there was a slight curve in the road, and I was going over a hill, and there was a body in the road in front of the driveway, in front of the Ellers' home. As to the position of that body, he was lying with his feet towards Mr. Eller's house, with his head across the road. He was not entirely prone; he was doubled up. He had his arm under his head, with his feet drawn up, and I seen him, approaching him, and swerved to the left to miss him. . . I did not hit the man. I saw him. I didn't have any trouble seeing him, and I didn't have any trouble going around him or missing him. . . There was room for an automobile on the pavement. . . It was just at the time of day that your lights don't do you any good . . . because it was light and dark as you approached around that hill there. The road there was not perfectly straight. There was an incline in the road, and a curve on the incline. He was about on top of the mound, as I recollect."

The photographs introduced by the defendant and referred to in the opinion were taken from points on the north side of the road, and show views of the road approaching Eller's mailbox both from the east and from the west. The edges of the highway from the curve to the mailbox appear as straight lines, indicating that, if there was a crest near the mailbox, it was so slight as to be unnoticeable.

From the photographs, from the testimony of Smith, who was able to see and avoid the plaintiff's son, and from the fact that several other cars had passed by without striking the son, the jury was authorized to infer that the defendant's driver could have seen the plaintiff's son from a distance of 100 feet and in time to have avoided striking him.

*Rehearing denied.*