## 48150. STRICKLAND v. DORAN.

EVANS, Judge. Mrs. Margie Strickland, plaintiff, filed suit against P. J. Doran, defendant, because defendant drove his car into and over the body of Larry Strickland and killed him. The lower court granted a summary judgment in favor of defendant, and plaintiff appeals. *Held:*

The learned and respected judge in the lower court has fallen into grievous error at the very outset in seeking to equate this case with that of *Southland Butane Gas Co. v. Blackwell,* 211 Ga. 665 (88 SE2d 6). The facts in the two cases are so widely variant that the *Southland* case cannot be equated with this case. The Supreme Court gave the facts of the *Southland* case, and we are bound by them, as follows: "As we construe the evidence, a finding was demanded that the deceased was lying drunk in the road, without physical capacity to move himself, *in the nighttime, at a point just over the crest of a slight hill, where the lights of an automobile approaching over the hill would not shine on the body of the deceased until it arrived within 12 or 14 feet of the body,* and the undisputed evidence of the driver of the truck was that *he did not see the deceased until he was within 12 or 14 feet of him,* and that he did everything within his power to avoid striking the deceased after discovering his presence in the highway by swerving his truck. *The further undisputed evidence is that the truck was traveling at a lawful rate of speed of 35 or 40 miles per hour, with its lights on bright.* "(Emphasis supplied.) Thus, the *Southland* case is definitely and positively one wherein the body of the deceased could not be seen at all until the lights of the motor vehicle shone upon him, as it was at night, and those lights did not shine on him until within *12 or 14 feet of the body.* Further, the driver in the *Southland* case swore he did not see the deceased until he was within 12 or 14 feet of him;

and made no claim that he mistakenly thought the body was an inanimate object. Further, his bright lights were on, and he was running at a lawful rate of 35 to 40 miles per hour.

A well-known and established rule of law is that testimony of a party when offered in his own behalf must be construed most strongly against him, and he is not entitled to a finding in his favor if that version the most unfavorable to him shows the verdict should be against him. *Southern R. Co. v. Hobbs,* 121 Ga. 428 (1) (49 SE 294).

This rule has been adhered to and, if possible, made stronger against the party who moves for a summary judgment. *Holland v. Sanfax Corp.,* 106 Ga. App. 1, 4, 5 (126 SE2d 442); *McCarty v. Nat. Life & Acc. Ins. Co.,* 107 Ga. App. 178, 179 (129 SE2d 408). All inferences arising from testimony must be construed in favor of the party who opposes a motion for summary judgment. If the party fails to answer forthrightly when direct questions are put to him, or answers in a vague and ambiguous fashion, the inference arises that a straight and direct answer would have been hurtful to the party moving for the summary judgment.

Shortly before Strickland was killed, another motorist traversed the same highway, headed in the same direction as was the Doran car. The driver of that earlier vehicle swore that both he and his father saw the object 50 to 60 feet away; his father asked him to drive into the other lane so as to avoid striking the object, which he did, and passed without incident.

Absolutely no plausible explanation is given for Doran's failure to drive as did the preceding motorist, and thus avoid running over and killing Strickland. All he had to do was to drive into the other lane. If he was observant and vigilant in keeping a watchout ahead of him, as he was duty bound to be under the law (see *Leggett v. Brewton,* 104 Ga. App. 580 (3) (122 SE2d 469)), then he could have easily driven past Strickland without coming into contact with his body.

Now let us compare the facts in the *Southland* case with the facts in the instant case, and at the same time point out wherein defendant Doran testified in a most unsatisfactory manner, giving vague and ambiguous answers to pertinent questions.

1. In *Southland,* the driver was within *12 to 14 feet* of the person who was lying in the highway before he could see him—while in the instant case, the driver, Doran, was *50 to 60 feet* away when he discovered Strickland lying in the highway.

2. In *Southland,* the driver had his bright lights on, whereas in the

instant case, the driver, Doran was not certain whether his lights were on bright or dim.

3. In *Southland,* the motor vehicle was being operated at 35 or 40 miles per hour, which was a lawful rate of speed; but in the instant case, the driver, Doran, fails to tell the rate of speed, designating it only as "moderate."

Further, it is important here to note certain other testimony of the defendant, Doran, as follows: a. He was uncertain as to whether it was raining at the time, and was uncertain as to whether the road was dry. b. Doran's attention was such he claims that he never did discover that Strickland was a human being, and had no such knowledge until his wife told him; then and only then did he apply brakes. c. Doran did not disclose how near he was to Strickland when his wife told him that they were approaching a person and absolutely nothing is suggested to show that he did not have time to turn into the other lane to avoid striking Strickland. d. Doran did not know whether his windows were up or down; whether his radio, defroster, or windshield wipers were turned on or off; he did not remember whether there was conversation going on among the occupants of his car. e. Doran did not know the length of the skidmarks left by his car.

We repeat that the *Southland* case cannot be equated with the instant case. It was impossible for the *Southland* driver to avoid running over the prone person in the 12 or 14 feet after discovery; whereas, in the instant case, there were 50 to 60 feet allowed, and another driver had shortly before safely turned into the other lane and thus avoided striking the prone body of Strickland. Why couldn't and why didn't Doran do likewise?

The *Southland* driver was driving at 35 to 40 miles per hour which was a lawful rate of speed. We do not know how fast Doran was driving, but it must have been at a high and reckless rate of speed. He would only say it was "moderate" speed, which is completely meaningless, and such ambiguous and vague testimony must be construed most strongly against him. His failure to stop or to turn into the other lane most likely was caused by his high and reckless speed.

The *Southland* driver had his bright lights on, as Doran should have done; but Doran does not remember whether his lights were on bright or dim. Could it be that they were not even turned on? Especially as he did not know whether his windows were up or down; nor whether his windshield-wipers were turned on, nor whether his defroster was on or off, nor whether his radio was

on or off. Doran was uncertain whether it was raining, or whether the pavement was dry, but he "believed" it was not raining, and he "believed" the road was dry. How could a normal person fail to remember such important events at the time he ran over and killed a human being?

The defendant in this case can secure no comfort whatever through contending that he saw the object 50 to 60 feet away (the driver of the first car said 60 feet), but did not know it was a human being. He never did tell how far away he was when he realized he was approaching a human being. But even so, in *Georgia S. &c. R. Co. v. Wilson,* 93 Ga. App. 94 (91 SE2d 71), at page 111, this court, in defining the duty of an engineer on a railroad engine who discovers what he thought to be an inanimate object, holds: " . . . it has been held that where an object is observed on the track and the employees are uncertain what it is, it is the duty of the engineer to take steps immediately to stop the train, even though the person on the track be a trespasser. [Cits.] *Central of Georgia R. Co. v. Pelfry,* 11 Ga. App. 119 (74 SE 854)."

Nor can the defendant escape liability by urging that the person he ran over was lying in the road because of intoxication. The drunken person does not thereby forfeit all rights to live and breathe. He cannot be wantonly killed under such circumstances, and one who causes his death by committing wilful negligence is liable for the consequences. See *Fox v. Pollard,* 52 Ga. App. 545, 548 (183 SE 854).

Of course, "wilful negligence" does not necessarily mean that the actor *intended to deliberately kill the deceased.* If there is such an absence of care as to raise the presumption of conscious indifference, this fulfills the definition of *wilful negligence. Frye v. Pyron,* 51 Ga. App. 613 (3) (181 SE 142).

In addition to the rule of law which requires that all evidence and inferences arising therefrom in motions for summary judgment be construed most unfavorably towards the movant, attention is also called to the rule of law which specifically requires that all questions of negligence, comparative negligence, and all degrees of negligence, be determined by a jury, and not by a judge on motion for summary judgment. *Reed v. Batson-Cook Co.,* 122 Ga. App. 803 (3 b) (178 SE2d 728).

For all of the foregoing reasons, the judgment of the trial court in granting a summary judgment to the defendant is reversed.

*Judgment reversed. Pannell, Deen, Quillian and Stolz, JJ., concur. Bell, C. J., Hall, P. J., Eberhardt, P. J., and Clark, J., dissent.*

ARGUED MAY 7, 1973 — DECIDED NOVEMBER 13, 1973 —
REHEARING DENIED DECEMBER 6, 1973 —

*G. Ralph Burger,* for appellant.

*Savell, Williams, Cox & Angel, Edward L. Savell, Elmer L. Nash,* for appellee.

CLARK, Judge, dissenting. We find ourselves in disagreement with the foregoing opinion because of a difference in the interpretation of the application to the facts of the instant case of *Southland Butane Gas Co. v. Blackwell,* 211 Ga. 665 (88 SE2d 6). As did the trial judge, we regard that Supreme Court ruling which was a reversal of the opinion of the Court of Appeals in 91 Ga. App. 277 (85 SE2d 542) to be on all fours with the case before us which is an appeal from a summary judgment rendered for defendant in a suit brought by a mother against a motorist whom she charged with having wrongfully caused the death of her 19-year-old son. As originally filed the complaint alleged defendant to have been negligent in the operation of his car when it struck the decedent while he was a pedestrian walking westerly on Shallowford Road east of the city limits of Marietta.

After defendant's summary judgment motion was filed which included in the supporting affidavits evidence which led the trial judge to make a finding of facts, "That the plaintiff's deceased son, Larry Strickland, became voluntarily drunk and either fell down or lay down on a public highway, and that the blood analysis showed a .22 per cent of ethanol alcohol" (R. 90) the plaintiff amended to allege wilful and wanton conduct. This amendment read "That said acts on the part of the defendant was wilfully and wantonly done in that the defendant saw the plaintiff's son some fifty (50) feet away and that there was no approaching traffic from the opposite direction, and that he wilfully and wantonly drove over the body of the plaintiff's son." (R. 88).

Defendant and his family were returning from a Saturday evening dinner engagement about 2:17 a. m. Physical facts presented were that Shallowford Road at this location is a two-lane highway, hilly and with small curves. The road was dry. The night was foggy, the road is not artificially lighted, and defendant does not remember whether his lights were on bright or dim. There was no other traffic on this two-lane country road. In answering plaintiff's interrogatories defendant stated he was driving at a moderate rate of speed in the west-bound lane. He describes the unfortunate event in these words: "I was approximately 50 feet

from the body when it was first seen. It was first thought to be debris or a gunny sack lying on the road. The object did not move either before or immediately prior to impact. It was lying prone on the road on the right side of the roadway as approached by automobile with the head of the body facing the oncoming traffic, lying on its back, supine in a spread-eagle pattern. After my headlights illuminated the body, my wife gave a warning that the object was a body. I immediately applied my brakes but there was not sufficient time to avoid the body. My car rolled over the body before I could bring it to a stop." (R. 36). He also testified that his car left skid marks but their length was never disclosed although measured by the police during their investigation on which no charges were made.

Defendant acknowledged he "had drunk wine with the meal. I had one after dinner drink, but that was five or six hours prior to the accident." (R. 38). The car was a 1967 station wagon with the tires in good shape and the brakes in proper working condition. "My car was serviced regularly, due to my job which required me to travel a good bit. The car was maintained by a local service station." (R. 38).

An affidavit from a witness returning from the same dinner party as defendant, deposed that a few minutes before the incident he had been in the west-bound lane of Shallowford Road and "As we crested a small hill, I noticed an object in the road about 50 to 60 feet away. My father noticed the object at about the same time and asked me to move into the other or east-bound lane. I did and as we approached the object I noticed that it was a body . . . When I first saw the body it was flat on its back with its head facing east. The right knee was folded and in the air." (R. 53). This witness' father added that after the incident when he returned to the place where the body was lying on the highway, "the body was in the same spot as it was when I first saw it with the exception that the leg was no longer folded into the air." (R. 57).

Other affidavits brought out the activities of the decedent on that fateful day. He and two co-workers, Priest and Lingerfelt, had left Roswell, Georgia, between 8 and 9 a. m. to install church pews for their employer in a small church in Colbert, Georgia. During the day deceased and Lingerfelt each bought and drank at least 12 cans of beer, had 6 mugs of beer with dinner and drank approximately 7 more cans of beer on the way back to Roswell, Georgia. After dinner the deceased told Priest he was drunk and did not want to go back to the church to pick up some tools, but instead wanted

to go home.

Priest deposed (R. 61 and 62) that deceased started passing out on the return trip. Priest did not drink any alcoholic beverages and drove until they reached his girlfriend's house in Roswell. This was about 11 p. m., some three hours before the unfortunate occurrence. Deceased then drove the truck to his employer's in Roswell. Priest's affidavit avers that when decedent drove off "he did not appear to be weaving." Some time thereafter, around midnight, the company manager was called to the company premises by the night watchman, as deceased and Lingerfelt, the other fellow-worker, were "creating a turmoil." (R. 58). He stated both were obviously drunk and that deceased would not permit him to drive deceased home.

In his affidavit submitted by plaintiff in opposition to defendant's summary judgment motion Lingerfelt differed as to the amount of beer consumed, stating he and deceased each "had consumed some 9 cans of beer (king size) over a period of 14 hours." (R. 72). Additionally, this affidavit states that neither he nor deceased was drunk, that deceased did not stagger and drove in a proper way at the time he drove off from the company parking lot.

Deceased's father found 4 cans of beer in the truck after the incident. Deceased's blood alcohol analysis showed the ethanol alcohol content to be .22 per cent. The toxicologist estimated that someone would have to consume "around ten 12-ounce cans of beer . . ." to have a .22 per cent blood alcohol. (T. 125).

The trial court having granted defendant's motion for summary judgment, plaintiff has taken this appeal.

1. In sustaining defendant's motion for summary judgment the trial judge cited the controlling authority to be *Southland Butane Gas Co. v. Blackwell,* 211 Ga. 665 (88 SE2d 6). In the headnote of this case the Supreme Court said: "[I]f one voluntarily becomes drunk and consequently falls down, or lies down, in a state of insensibility on a public highway, so that he is injured by a passing motor vehicle, he cannot recover for injuries so received, even though there may have been contributory negligence on the part of the operator of the motor vehicle, where such negligence on the part of the operator did not amount to wilful and wanton negligence. The last clear chance or humanitarian doctrine is applicable only where the defendant knows of the plaintiff's perilous situation, and realizes, or has reason to realize, his helpless condition."

The trial judge found that deceased "became voluntarily drunk

and either fell or lay down on a public highway." (R. 90). Nothing was presented to controvert this finding of fact. Deceased does not qualify as "a pedestrian using the highway for the purposes of travel, and the defendant therefore was under no duty to anticipate his presence upon the highway in that position, or to avoid injuring him until his presence became known to the driver, . . ." *Southland Butane Gas Co. v. Blackwell,* supra, p. 669.

2. Therefore, the only issue sub judice is whether defendant upon first viewing the object "some 50 feet" away should have changed to the east-bound lane where there was no approaching vehicle to avoid an object on the roadbed which he thought was inanimate. A previous motorist, thinking this object was a limb, had changed lanes to avoid the object before he realized it was a person. But this action by the other motorist does not make the nonaction by defendant amount to wilful and wanton negligence under the facts in the case sub judice in the light of the following authorities: "[T]he defendant's conduct . . . [must be] such as to evince a wilful intention to inflict the injury, or else was so reckless or so charged with indifference to the consequences, where human life or limb was involved, as to justify the jury in finding a wantonness equivalent in spirit to actual intent." *Central of Ga. R. Co. v. Moore,* 5 Ga. App. 562, 565 (63 SE 642). In accord, *Tice v. Central of Ga. R. Co.,* 25 Ga. App. 346 (103 SE 262); *Southern Grocery Stores, Inc. v. Herring,* 63 Ga. App. 267 (11 SE2d 57).

"A reckless and wanton disregard of consequences, evincing a willingness to inflict injury or produce death, may amount to wilfulness, although there is no direct proof of actual intention to inflict the injury or produce the death. *Central Railroad & Banking Co. v. Denson,* 84 Ga. 774 (11 SE 1039); *Western & Atlantic R. Co. v. Bailey,* 105 Ga. 100 (31 SE 547); and *Lowe v. Rayne,* 156 Ga. 312, 316 (118 SE 924)." *Carr v. John J. Woodside Storage Co.,* 217 Ga. 438, 443 (123 SE2d 261).

"In an action to recover damages for injuries alleged to have been inflicted by reason of negligence, before the person charged with the negligence can be held guilty of wilful or wanton negligence the evidence must show that he knew his conduct would inflict injury, or that, on account of the attendant circumstances which were known to him, or with knowledge of which he was chargeable, the inevitable or probable consequence of his conduct would be to inflict injury, and with reckless indifference to the consequences of such conduct he committed the act, or omitted to do his duty to avoid the threatened injury." Alabama Great So. R. Co. v. Hall, 105

Ala. 599 (17 S 176) as quoted by *Southern R. Co. v. Davis,* 132 Ga. 812, 818 (65 SE 131). The *Davis* case on page 816 adds that "there must have been some wilful misconduct, or that entire want of care which would raise the presumption of a conscious indifference to consequences."

We agree with the trial court's finding that "there was not one scintilla of wilful or wanton negligence." (R. 91). See *Martin v. Glenn's Furniture Co.,* 126 Ga. App. 692, 699 (191 SE2d 567).

3. We next consider the applicability of the last clear chance doctrine. In doing so we have available the recent five-four decision of *Layton v. Knight,* 129 Ga. App. 113 (198 SE2d 915). In that case, as in the one at bar, the plaintiff had appealed the grant of a summary judgment to a defendant motorist. The plaintiff in that case, as in the one at bar, contended that the doctrine of last clear chance applied and that this issue should go to the jury. In that case, there was 152 feet from the point at which the incident occurred which caused the plaintiff to skid and the point of impact, and the plaintiff contended that in this distance of 152 feet (three times the 50 feet in the case sub judice) the defendant had the last clear chance to avoid the result of the plaintiff's negligence. The majority of this court held that even assuming that the defendant was aware of the plaintiff's negligence 152 feet away, he had only 2.4 seconds to react and that at the rate of speed of 45 miles per hour at which he was traveling, the stopping distance would be 217 feet (50 feet perception distance plus 50 feet reaction distance plus 117 feet of vehicle stopping distance). Since his stopping distance was 217 feet and there was only 152 feet of distance from the emergency to the impact, the defendant's only possible course of action would have been to immediately hurl himself off of the highway with full right wheel steering, a risky maneuver at best. As the court said at page 114 of the opinion: "To say that the doctrine of last clear chance should apply under this set of facts is a patent absurdity." In the instant case, it is undisputed that the defendant was not aware of the existence of any object in the road until he was within 50 feet of it. It is also undisputed that the speed limit was 45 miles per hour, and that the defendant was driving within the speed limit. If the doctrine of last clear chance did not apply in the *Layton* case where there was 152 feet of distance between the defendant and the emergency, clearly it does not apply in the instant case where, at the maximum, there was only "some 50 feet" of distance between the defendant and the emergency.

Even though the previous motorist had gone into the other lane

to avoid hitting what was then thought to be a limb (which impression may have been caused by the bent upright leg which was the body's position at that time and not at the time when defendant saw the object), it was not incumbent upon defendant to take that action in the emergency created by decedent. To require that defendant cross the center-line and violate traffic laws by driving westward in an east-bound lane to avoid what defendant thought was an inanimate object would be requiring him not only to place his life and the lives of his family in peril but to endanger the lives of any who might be approaching on this hilly, curvy country two-lane road.

Only at the point in time when he realized that the object was a human being did defendant have any duty to avoid the body. It was only when the headlights of defendant's car illuminated the object that defendant's wife indicated that the object was a human being. At this time the evidence is undisputed that defendant immediately applied brakes but was unable to stop in time to avoid the totally unexpected body which he could not avoid. This element is emphasized in the Supreme Court's opinion in the *Southland Butane* case, a certiorari decision which reversed the Court of Appeals judgment reported in 91 Ga. App. 277 (85 SE2d 542). Our court's opinion had suggested at pages 285 and 289 that the defendant could have seen the plaintiff's deceased 100 feet away, but that the defendant did not realize it was a body until he was at a distance of 12 to 14 feet. The Supreme Court, under its view of the case, was not concerned about what the defendant could have seen but was concerned only with what he did see and did realize.

4. "Where the parties have had full opportunity to obtain and submit affidavits, a summary judgment should be granted where there is no evidence showing wilful and wanton negligence, that being the standard required. Hufner v. Erie R. Co., 26 FSupp. 855; Braughton v. United Air Lines, 189 FSupp. 137; Alderman v. Baltimore & Ohio R. Co., 113 FSupp. 881; Early v. Roadway Express, Inc., 106 FSupp. 958; Herring v. Eiland (Fla.), 81 S.2d 645. This is particularly true where, as here, there is no material conflict in the evidence upon which that issue must be determined." *Herring v. R. L. Mathis &c. Co.,* 121 Ga. App. 373, 378 (173 SE2d 716).

""There must be affirmative evidence of facts tending to show wilfulness, wantonness, or the existence of particular circumstances from which an inference of conscious indifference to consequences might legitimately be drawn . . . If this be not the

law, then practically every case of negligent injury can be made the vehicle of submitting to the jury the question of wilfulness and wantonness, by merely using adjectives in describing the character of the negligence.' *Southern R. Co. v. Davis,* 132 Ga. 812, 819 [65 SE 131]. 'It will not do to say that the jury are the judges of whether such conduct exists. They are not the judges of it, where there is no evidence of it.' Id. p. 818 [Citations]. Wilful and wanton negligence does not arise from a situation of implied notice—one where the defendant 'should have known.' *Western & A. R. Co. v. Michael,* 175 Ga. 1, 10 (165 SE 37). '[W]here all the testimony relating to a question of fact excludes every reasonable inference but one, the issue becomes an issue of law, for determination by the court.' [Citations]. The rule that a summary judgment should be granted if there is no genuine issue of material fact for resolution by a jury is but another way of stating this rule. Where 'conduct is susceptible of but one inference that it is not negligent, or, in cases of wantonness, that it is not wanton, and reasonable minds could draw only such inference therefrom, then the absence of negligence, or the absence of wantonness, is a question of law for the determination of the court.' *Arrington v. Trammell,* 83 Ga. App. 107, 113 (62 SE2d 451)." *Herring v. R. L. Mathis &c. Co.,* supra, at 381, 382.

"There is no disagreement with the proposition that one who moves for summary judgment has the burden of demonstrating that the opposite party can not lawfully recover. Every judge on the court has joined in that holding several times. But in instances when the burden has been carried, as here, if we should hold that the grant was not proper we would, in effect, be nullifying the Summary Judgment Act, now included in § 56 of the Civil Practice Act. It would render the Act meaningless, and one can not conclude that this is the case. It has served and serves a useful purpose, viz., to eliminate the necessity of a trial by jury when there is no genuine issue of fact to be tried. [Cits.] If the evidence introduced by movant pierces the pleadings and discloses the absence of a right of recovery, the grant of summary judgment is proper and should follow. *Scales v. Peevy,* 103 Ga. App. 42 (118 SE2d 193); *General Gas Corp. v. Carn,* 103 Ga. App. 542 (120 SE2d 156), both approved in *Crutcher v. Crawford Land Co.,* 220 Ga. 298, 304 (138 SE2d 580)." *Brown v. J. C. Penney Co.,* 123 Ga. App. 233 (180 SE2d 364).

Defendant who is the movant in the instant case has shown that no genuine issue exists as to any material fact. Thus he has pierced the pleadings and the trial court properly granted defendant's

motion for summary judgment.

I am authorized to state that Chief Judge Bell and Presiding Judges Hall and Eberhardt concur in this dissent.